[No. S004553 Crim. No. 23155. Nov. 3, 1988.]

THE PEOPLE, Plaintiff and Appellant, v.
KELVIN SHELBY MALONE, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Supreme Court, Monica Knox, Acting State Public Defender, Edward H. Schulman, Chief Assistant State Public Defender, and Nancy Gaynor, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Frederick R. Millar, Jr., and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PANELLI, J.**—This is an automatic appeal from a judgment of death imposed under the 1978 law. (Pen. Code, § 190.1 et seq.; see *id.*, § 1239,

subd. (b).)[1] Defendant was convicted of kidnapping for the purpose of robbery (§ 209), robbery (§ 211) and first degree murder (§§ 187, 189). The jury found true the firearm-use allegations (§ 12022.5) and the special circumstance allegations that the murder had been committed during a robbery and a kidnapping (§ 190.2, subd. (a)(17)(i), (ii)). In a separate proceeding the jury also found true the special circumstance allegation that defendant had previously been convicted of a first degree murder. (§ 190.2, subd. (a)(2).) The jury fixed punishment at death. The court ordered the prison terms imposed on the kidnapping for robbery and robbery charges stayed pending imposition of the death penalty. We affirm the judgment in its entirety.

## FACTS

### I. GUILT PHASE

Myrtle Benham was beaten to death in an abandoned shack in the desert near Daggett, California, on March 20, 1981. The San Bernardino Sheriff's Department found her body one week later. She was lying face down and nude below the waist. Some of her clothing was around her left foot.

In a seemingly unrelated incident, defendant and Michael Crenshaw were arrested on March 24, 1981, in San Jose. Two San Jose police officers observed Crenshaw and defendant sleeping in a car while the engine was running. When the officers approached the car and asked defendant, the driver, to get out, defendant drove away, knocking one officer to the ground. Defendant and Crenshaw were arrested after a high speed chase that culminated in their car colliding with a police car.

During the chase a .25-caliber Raven automatic pistol was thrown from the car. A .25-caliber Galesi pistol was found under the driver's seat. Credit cards in the names of Minnie Ola White and Jim Rankin were found in the car, as were two tape recorders belonging to Jim Rankin. When defendant was booked, he had in his possession rings belonging to Benham and White.

*Prosecution Evidence.* Crenshaw testified at the preliminary hearing, but at trial asserted his Fifth Amendment privilege and refused to testify. The court determined Crenshaw was unavailable as a witness and allowed his preliminary hearing testimony to be read to the jury.

Crenshaw testified he and defendant were driving from Las Vegas on March 20, 1981, when they stopped in Baker at an Exxon gas station where

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Benham worked. Defendant emerged from the car with a pistol in each hand, took the money and cash drawer from the register and ordered Benham into the car trunk. Defendant eventually stopped the car near a shack in the desert and told Crenshaw he was going to "take the lady inside" and have sex with her. When Crenshaw later went inside the shack, he saw defendant, his pants down, lying on top of Benham. Benham was face down, nude below the waist. Defendant hit her in the head with a pipe, then left the area with Crenshaw. After driving to Barstow, the two burned the car.

Much of Crenshaw's testimony was corroborated by Charles Laughlin, who claimed to have spoken with defendant on several occasions while the two were in jail.

Evidence was admitted showing defendant had been convicted of the first degree murder of White. On March 21, 1981, the day after the Benham murder, White's body was found 14 miles north of Blythe (near Vidal Junction, California) in the trunk of her car. She had been killed by a bullet from the Raven automatic pistol thrown from the car during the March 24 chase in San Jose. A piece of skin tissue consistent with White's blood type was found on defendant's trousers when he was arrested. Laughlin testified defendant told him that while driving to California he and Crenshaw had noticed an apparently abandoned car. When they approached the car they found an elderly woman in the front seat. They forced her into the trunk, shot her and took her money and valuables.

At the time defendant and Crenshaw kidnapped Benham, they were driving a car belonging to Rankin. Rankin was last seen at a Kansas City restaurant on March 18, 1981. Laughlin testified defendant told him about kidnapping a man in Kansas City, putting the man in the trunk of his own car, taking his money and jewelry and then driving off to California.

Leroy Combs testified that when he saw defendant on March 11, 1981, he was alone and in possession of two firearms—the Raven and Galesi pistols.

*Defense Evidence.* The defense introduced evidence of a polygraph test indicating defendant did not himself kill Benham, but he had been present. Evidence was also presented that Crenshaw had pleaded guilty to the first degree murder of White.

Defendant testified in his own behalf. He admitted he had escaped from Monterey County jail and on March 11, 1981, had kidnapped Combs. Defendant forced Combs to drive to Los Angeles and later placed him in the trunk of the car. After the Combs kidnapping he took a Greyhound bus

to St. Louis, Missouri to meet Crenshaw, who lived in nearby Berkeley. He hitchhiked from the Greyhound station to Crenshaw's house. His plan was to have the two work their way back to California through various robberies and thefts. Although both pistols belonged to him, he carried the Galesi and gave Crenshaw the Raven.

He and Crenshaw stole Rankin's car from a Kansas City restaurant for transportation to California. The theft was defendant's idea. Rankin had left the keys in the car and gone off with a woman in another car. En route to California they drove through Las Vegas to snatch a purse for money; defendant snatched the purse.

Crenshaw and he robbed the Exxon station together. Defendant was the first to pull his weapon and demand money. Afterward, Crenshaw and Benham got into the backseat of the car. Benham was never in the trunk. Defendant drove to the deserted shack to let Benham go. Crenshaw took her into the shack to tie her up and leave her. When Crenshaw returned a few minutes later, he made no mention of raping or killing Benham. Defendant and Crenshaw then drove to Barstow, where defendant stole another car and the two burned Rankin's car.

With defendant using Rankin's credit card in Vidal Junction to pay for gas, the two returned to Las Vegas before turning back towards Los Angeles. While Crenshaw drove, defendant fell asleep. He later awoke near Blythe to find Crenshaw gone and the car parked on a side road. Defendant did not know that White had been killed in the area.

Defendant denied Laughlin's testimony and claimed all of Laughlin's information resulted from his having gone through defendant's papers and police reports while the two were in jail together.

## II. PENALTY PHASE EVIDENCE

*Prosecution Evidence.* At the penalty phase the prosecution introduced evidence that on March 10, 1981, defendant and one Olden robbed a service station in Arroyo Grande, California. Michael Buss, the attendant, testified Olden wielded a shotgun while defendant ripped out the telephone and took the keys to Buss's fiancee's car.

On March 17, 1981, William Parr, a St. Louis, Missouri cab driver, was dispatched to a building near the Greyhound depot. His body was found in a park several hours later, a bullet through his brain. The bullet came from defendant's Galesi firearm. Parr's taxicab was found abandoned near Crenshaw's residence.

Thomas Smith, an inmate at Chino State prison, testified that on his arrival at the prison defendant advised him how to protect himself from other inmates and offered him a weapon. Defendant subsequently told Smith he was part of a group that would protect him if Smith would allow its members to sodomize him. Defendant told Smith he had "no choice." Thereafter defendant held Smith's head while another man sodomized him. Members of the group subsequently kicked and choked Smith; he did not know if defendant participated in the beating.

Inmate Laughlin testified to Rankin's death. Defendant told Laughlin he placed Rankin in the trunk of Rankin's vehicle, then later let him out and made him plead for his life before shooting him. Defendant partially covered Rankin's body with dirt and a vinyl tarp. Defendant told Laughlin that Rankin "was made to beg for his life and he filled his head with lead."

*Defense Evidence*. Defendant presented evidence Smith had given inconsistent statements concerning defendant's part in the sodomy attack on him. Defendant also presented evidence he was not involved in the attack.

Terry Caylor, an incarcerated felon, testified Laughlin said he would not have to stand trial in his own case because he was going to testify against defendant. Laughlin told Caylor he and Crenshaw had a "deal" and he could get all the information he needed from Crenshaw. Caylor saw Laughlin and Crenshaw talking together. The parties stipulated that the escape charge pending against Laughlin had been reviewed and dismissed by a prison review board for insufficient evidence and no further action was taken on the charge.

The testimony of George Gunn, a Missouri state court justice, at defendant's Riverside trial for the murder of White was presented. Defendant and a companion robbed Gunn in Missouri in 1979. Defendant's companion held a revolver to Gunn's face with the hammer cocked. After the two took Gunn's money, defendant returned Gunn's glasses before fleeing.

Defendant's family members and numerous teachers and counselors testified to his background and difficult childhood. Defendant was the product of an interracial marriage, which subjected him to racial epithets and left him confused about his identity. His father's military career led to an unstable family life, with his father, a harsh authoritarian, frequently absent for long periods of time.

Defendant had significant learning and social problems in school, but the schools lacked the resources to give him the help he needed. Expert testimony indicated defendant had some brain damage that affected his behavior

and personality. He was a hyperkinetic child and continues to suffer from an attention deficit disorder, but he could function in the structured prison environment. Defendant tends to be a follower, not a leader.

Defendant was close and affectionate with his family. He has fathered two children; he married the mother of one.

## DISCUSSION

## I. GUILT PHASE ISSUES

### A. *Denial of Representative and Impartial Jury.*

Defendant contends the exclusion of some potential jurors for cause in accord with *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] denied him his due process and Sixth Amendment rights to an impartial and representative jury. The United States Supreme Court has rejected these contentions (*Lockhart* v. *McCree* (1986) 476 U.S. 162 [90 L.Ed.2d 137, 106 S.Ct. 1758]), as have we (e.g., *People* v. *Babbitt* (1988) 45 Cal.3d 660, 679 [248 Cal.Rptr. 69, 755 P.2d 253]; *People* v. *Anderson* (1985) 38 Cal.3d 58, 60 [210 Cal.Rptr. 777, 694 P.2d 1149]).

### B. *Disclosing Prior-murder-conviction Special Circumstance.*

■ Defendant offered to stipulate to the prior-murder conviction underlying the prior-murder-conviction special-circumstance allegation (§ 190.2, subd. (a)(2)) to keep it from the jury before trial. The court rejected the stipulation on grounds it was precluded by article I, section 28, subdivision (f) of the California Constitution (Proposition 8), which provides that "[w]hen a prior felony conviction is an element of any felony offense, it shall be proven to the trier of fact in open court." As the Attorney General concedes, however, because the charged murder in this case occurred before June 9, 1982, Proposition 8 has no application. (*People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149].)

Defendant asserts the court erred in rejecting the stipulation. Citing section 1093,[2] section 190.1,[3] *People* v. *Hall* (1980) 28 Cal.3d 143 [167 Cal.Rptr. 844, 616 P.2d 826] and *People* v. *Bracamonte* (1981) 119 Cal.App.3d 644 [174 Cal.Rptr. 191], he argues he had both a statutory and constitutional due process right to a bifurcated trial on the truth of the prior-murder-conviction special-circumstance allegation.

Assuming, without deciding, that the court erred in refusing defendant's stipulation, the error was harmless in light of our determination, *post* at pages 20-22 that evidence of the prior murder was properly admitted at trial. Moreover, in light of the overwhelming evidence of defendant's guilt of the Benham murder, it is not reasonably probable a result more favorable to defendant would have been reached had the jury not been informed of the prior-murder conviction. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## C. *Admission of Uncharged Crimes.*

Defendant asserts error in the admission of evidence of the Riverside murder of White, the robbery and kidnapping of Rankin and the kidnapping of Combs.

The principles governing admission of uncharged crimes are well established. "Evidence of other crimes or prior bad acts is inadmissible solely to prove an accused had the predisposition to commit the charged offense. (Evid. Code, § 1101, subd. (a); *People* v. *Alcala* (1984) 36 Cal.3d 604, 631 [205 Cal.Rptr. 775, 685 P.2d 1126]; *People* v. *Willoughby* (1985) 164 Cal.App.3d 1054, 1062 [210 Cal.Rptr. 880].) However, the evidence may be admitted when it is relevant to prove another issue in the case such as opportunity, intent, knowledge, identity, or absence of mistake. (Evid. Code, § 1101, subd. (b).) Because of its inflammatory impact, evidence relevant on one of these theories should be excluded when it is 'not relevant to an issue expressly in dispute [citation], . . . "merely cumulative . . ." [citations], or . . . more prejudicial than probative under all the circum-

---

[2] Section 1093 provides in pertinent part: "The jury having been impaneled and sworn, unless waived, the trial shall proceed in the following order, unless otherwise directed by the court: [¶] (a) If the accusatory pleading be for a felony, the clerk shall read it, and state the plea of the defendant to the jury, and in cases where it charges a previous conviction, and the defendant has confessed the same, the clerk in reading it shall omit therefrom all that relates to such previous conviction. In all other cases this formality may be dispensed with."

[3] Pursuant to section 190.1, subdivisions (a) and (b), if the jury finds the defendant guilty of first degree murder, "it shall at the same time determine the truth of all special circumstances charged," except for the special circumstance of having previously been convicted of first or second degree murder, which special circumstance shall thereupon be determined in "further proceedings."

stances. [Citations.]' (*People* v. *Alcala, supra,* at pp. 631-632. Accord, *People* v. *Thompson* (1980) 27 Cal.3d 303, 314-318 [165 Cal.Rptr. 289, 611 P.2d 883].)" (*People* v. *Miranda* (1987) 44 Cal.3d 57, 82-83 [241 Cal.Rptr. 594, 744 P.2d 1127].) ■ In sum, to be admissible, evidence of other crimes must be relevant to some material fact in issue, must have a tendency to prove that fact, and must not contravene other policies limiting admission, such as Evidence Code section 352. (*People* v. *Thompson* (1988) 45 Cal.3d 86, 109 [246 Cal.Rptr. 245, 753 P.2d 37]; *People* v. *Thompson* (1980) 27 Cal.3d 303, 315-318 [165 Cal.Rptr. 289, 611 P.2d 883].)

1. *The Rankin Offenses.*

Defendant acknowledges evidence concerning the Kansas City theft of Rankin's car and credit cards was admissible as intertwined with the charged crimes, in that Rankin's car was used to transport Benham to the scene of her murder and defendant used his credit cards to buy gas in Vidal Junction. (E.g., *People* v. *Viniegra* (1982) 130 Cal.App.3d 577, 582 [181 Cal.Rptr. 848].) ■ Defendant argues the court erred in failing to sever from the admissible evidence the further evidence of Rankin's kidnapping and murder—his murder implied from evidence he was never seen again after defendant stole his car. (*People* v. *Dabb* (1948) 32 Cal.2d 491, 500 [197 P.2d 1]; *People* v. *Haston* (1968) 69 Cal.2d 233, 245 [70 Cal.Rptr. 419, 444 P.2d 91].)

Before allowing Laughlin to testify to defendant's jailhouse statements, the trial court ruled admissible evidence concerning the circumstances of the taking of Rankin's car, including when he was last seen, but ruled inadmissible evidence Rankin is missing or was murdered. Contrary to defendant's assertion the court did not weigh the evidence's prejudicial effect against its probative value (Evid. Code, § 352), the court expressly recognized the "serious consequences" of admitting evidence of the Rankin offenses.

Thereafter, asked by the prosecutor what defendant had told him about the circumstances surrounding the theft of a car, Laughlin replied defendant said he had stolen a vehicle from a male in the parking lot of a restaurant in Kansas City, had taken money and jewelry from him, and had then placed him in the trunk of the car and left. Defense counsel did not object. Rankin's wife testified the blue Buick used in the crime resembled her husband's and identified the stolen credit cards as his. He normally kept the cards in his wallet, which he kept in his pants pocket. He was due back from Kansas City March 20, 1981, but she has not seen him since.

We believe in its ruling the trial court properly severed the most prejudicial aspects of the Rankin incident from the most relevant portions. (See

*People* v. *Dabb, supra,* 32 Cal.2d at p. 500.) Admission of the kidnapping evidence was not error. That defendant had kidnapped Rankin was part of the circumstances of the theft of his car and credit cards and as such was relevant. Although Mrs. Rankin's testimony she had not seen her husband since March 1981 arguably suggested Rankin was missing, the testimony was not in violation of the court's ruling, nor did defense counsel object. The evidence, in any event, fell far short of establishing Rankin was dead or had been murdered, nor did the prosecutor exploit the issue. Any error therefore was harmless.

Defendant contends it was prejudicial for the prosecutor to put Rankin's wife on the stand—"to parade family members of murder victims before the jury." Mrs. Rankin's testimony concerning the Buick and the credit cards, however, was relevant and she clearly was the logical witness to establish these facts.

2. *The Combs Kidnapping.*

On March 11, 1981, Combs was kidnapped by defendant at gunpoint and forced to drive from Santa Maria to Los Angeles, where defendant placed him in the trunk of his car, but subsequently let him go. The trial court ruled Combs could testify to defendant's possession of both revolvers (the Raven and the Galesi), but evidence of the kidnapping should be excluded. The evidence came in, however, during cross-examination of defendant, after he denied on direct having been convicted of any serious crimes of violence. Defendant acknowledges defense counsel's question about his convictions opened the door for the prosecutor to cross-examine defendant on the kidnapping, notwithstanding lack of a conviction for the offense. (See *People* v. *Lanphear* (1980) 26 Cal.3d 814, 833-834 [163 Cal.Rptr. 601, 608 P.2d 689], vacated *California* v. *Lanphear* (1980) 449 U.S. 810 [66 L.Ed.2d 13, 101 S.Ct. 57], reiterated *People* v. *Lanphear* (1980) 28 Cal.3d 463 [171 Cal.Rptr. 505, 622 P.2d 950].) He claims, however, counsel was incompetent for creating the situation that permitted the prosecutor to elicit evidence of the other crime.

The record shows that in asking defendant about his criminal history, defense counsel misspoke. Although counsel asked defendant, "Have you ever been convicted of any serious crimes of violence such as rape or mayhem or murder or anything like that?" he intended to ask only whether or not defendant "had ever killed anybody or raped or committed murder"; indeed, until the court corrected him, this is the question counsel believed he had asked. Such a slip of the tongue does not, in our view, establish ineffective assistance of counsel. ■ The issue, in any event, is whether counsel's error prejudiced defendant. (*People* v. *Fosselman* (1983) 33 Cal.3d

572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People* v. *Pope* (1979) 23 Cal.3d 412, 415 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

Although the Combs kidnapping tended to suggest defendant played a dominant role in the Benham kidnapping, in that both victims were placed in the trunk of a car, it also strongly reinforced defendant's defense that, on his own, he did not commit homicides. At defense counsel's request the jury heard Combs's prior testimony at defendant's Riverside trial, wherein Combs related how defendant, on placing him in the trunk, asked if he could breathe and later, during a stop for gasoline, asked if he was "okay" and ultimately released him unharmed. In light of all the other evidence connecting defendant to the Benham crime, including his admission of robbing Benham at the gas station and driving the car to the murder site, his possession of her rings, and Laughlin's testimony to his confession, it is not reasonably probable a determination more favorable to defendant would have resulted in the absence of counsel's improvident question. (*People* v. *Pope, supra,* 23 Cal.3d at p. 425; *People* v. *Fosselman, supra,* 33 Cal.3d at p. 584; see *Strickland* v. *Washington* (1984) 466 U.S. 668, 693-694 [80 L.Ed.2d 674, 697, 104 S.Ct. 2052].)

### 3. *The White Murder.*

White's body was found one day after and in the same general desert area as Benham's abduction. Defendant asserts admission of White's murder was error. We disagree. The evidence, rather, was admissible on the issues of intent and identity.

One theory of the prosecution's case was that defendant personally, wilfully and with premeditation and deliberation, killed Benham. Proof of this theory required that defendant be identified as the actual killer and his intent be proved. Another theory was that defendant aided and abetted Crenshaw in the killing. This theory, too, required proof of defendant's knowledge and intent. Hence, identity and intent were material issues of importance (see, e.g., *People* v. *Bigelow* (1984) 37 Cal.3d 731, 748-749 [209 Cal.Rptr. 328, 691 P.2d 994, 64 A.L.R.4th 723]), relating to facts actually in dispute (see *People* v. *Thompson, supra,* 27 Cal.3d at p. 315). (Cf. *People* v. *Allen* (1986) 42 Cal.3d 1222, 1270-1271 [232 Cal.Rptr. 849, 729 P.2d 115] [details of former crimes admissible to show identity and intent].)

Defendant cites *People* v. *Bigelow, supra,* 37 Cal.3d 731 for the proposition that even if intent were an issue, the White murder was not probative of his intent and hence was irrelevant. In *Bigelow* the defendant was convicted of first degree murder with felony-murder special circumstances for a murder committed with an accomplice. Evidence of defendant's two prior rob-

beries with the accomplice, in which defendant wielded the weapon, was admitted at the guilt phase. On appeal the Attorney General argued the two uncharged offenses were admissible to prove defendant's identity as the triggerman in the charged offenses. We concluded otherwise. The only common marks, we observed, were defendant's presence and that the victim was ordered to lie down. The first, we stated, was immaterial, since the defendant's presence is not part of any modus operandi, and the second was not sufficiently distinctive to justify admissibility. (*Id.* at p. 749.) Here, too, defendant argues, the offenses were too dissimilar to raise an inference of identity or intent: Benham was kidnapped, White was not; Benham was beaten to death, White was shot; there was evidence of a sexual assault in connection with Benham's death, there was none as to White.

The record shows, however, substantial and distinctive similarities between the offenses. Elderly women, alone and vulnerable, were the victims in each. Their murders occurred in isolated desert areas. Items of personal property, including jewelry, were taken in both and were subsequently found in defendant's possession. A weapon belonging to defendant was used in the White murder and the Benham robbery. In each the victim at some point was placed in the trunk of a car. In each, significantly, the victim was considerably heavier than Crenshaw, who weighed only about 120 pounds and was several inches shorter than defendant—White weighed 180 pounds and Benham was a notably "large" woman. Arson to destroy evidence was involved in both, as defendant burned the Buick used to transport Benham and burned White's purse. On these facts, the White offense shared sufficient distinctive common marks with the Benham offense to raise an inference of identity, knowledge and intent. (See *People* v. *Robbins* (1988) 45 Cal.3d 867, 879-880 [248 Cal.Rptr. 172, 755 P.2d 355]; *People* v. *Thornton* (1974) 11 Cal.3d 738, 756 [114 Cal.Rptr. 467, 523 P.2d 267], disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].)

■ Defendant argues that even if the White murder was relevant, the court abused its discretion in failing to weigh prejudice against probative value. (Evid. Code, § 352; *People* v. *Green* (1980) 27 Cal.3d 1, 25-26 [164 Cal.Rptr. 1, 609 P.2d 468].) Although the court did not expressly weigh the prejudicial effect of the White murder against its probative value, the record is clear the court understood its duty to make such a determination and impliedly did so. Defense counsel argued Evidence Code section 352 to the court; preliminary to its ruling the court observed that "This is probably the area where the Court can come the closest to committing some kind of error because it's the area that provides for the greatest leeway of interpretation, I suppose, as to what the law is. [¶] The words are simple, but when you begin to apply those words, it becomes very complex;" and immediately

after its ruling admitting the White evidence, the court, in ruling on the Rankin offenses, expressly referred to the prejudicial effect of the evidence under section 352. After trial, in ruling on defendant's new trial motion, the court again recognized "the fine line in this area of uncharged offenses" and stated that from its research at the time of its rulings it was convinced the material admitted was of evidentiary value although "highly prejudicial to the defendant."

The foregoing suffices to satisfy the requirement that the record "affirmatively show that the trial judge did in fact weigh prejudice against probative value" (*People* v. *Green, supra,* 27 Cal.3d at p. 25) so as to permit meaningful appellate review and ensure that the ruling on the motion is " 'the product of a mature and careful reflection on the part of the judge,' . . ." (*Ibid.*) Any error, therefore, in the court's failure expressly to state on the record its determination that the probative value of the evidence outweighed its prejudicial value, on this record is nonprejudicial. (*People* v. *Frank* (1985) 38 Cal.3d 711, 731-732 [214 Cal.Rptr. 801, 700 P.2d 415].)

4. *Standard of Prejudice.*

■ Relying on *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111], defendant maintains that as with error in admitting priors for impeachment purposes, error in admitting other-crimes evidence for the purpose for which it was admitted is a denial of due process and thus subject to a *Chapman* standard of review. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].) The Attorney General responds that *Watson* applies. (*People* v. *Watson, supra,* 46 Cal.2d 818.) We agree. (See *People* v. *Rivera* (1985) 41 Cal.3d 388, 393 [221 Cal.Rptr. 562, 710 P.2d 362]; *People* v. *Tassell* (1984) 36 Cal.3d 77, 89 [201 Cal.Rptr. 567, 679 P.2d 1].)

Moreover, as indicated, we believe there was no error in admitting the Rankin evidence. We are of like mind concerning the White evidence. However, assuming arguendo error in admitting the White murder, it was nonprejudicial under *Watson.* Defendant admitted he robbed Benham and transported her to the site of her death. His lie detector test indicated he was present when she was killed. Crenshaw testified defendant robbed, kidnapped and murdered Benham. Laughlin testified defendant admitted the crimes. Defendant was in possession of the victim's rings when he was arrested.

In light of the overwhelming evidence of defendant's participation in the charged offenses, there is no reasonable probability the result would have been more favorable to defendant had the White murder been excluded.

D. *Admission of Preliminary Hearing Testimony.*

Although Crenshaw waived his Fifth Amendment privilege against self-incrimination for purposes of the preliminary hearing, he subsequently reconsidered his position and declined to testify at trial.[4] Over defendant's objection, the trial court found Crenshaw to be unavailable as a witness (Evid. Code, §§ 240, 1291, subd. (a)) and permitted his preliminary hearing testimony to be read to the jury. Defendant acknowledges Crenshaw's waiver of his Fifth Amendment privilege at the preliminary hearing did not preclude him from asserting the privilege at trial. (*Overend* v. *Superior Court* (1900) 131 Cal. 280, 284 [63 P. 372]; see *People* v. *Maxwell* (1979) 94 Cal.App.3d 562, 570 [156 Cal.Rptr. 630].) ■ He contends, however, the use in a capital case of the transcript of accomplice testimony—testimony recognized to be "inherently untrustworthy" (see *In re Miguel L.* (1982) 32 Cal.3d 100, 108 [185 Cal.Rptr. 120, 649 P.2d 703])—denied him his state and federal constitutional rights to confrontation and due process (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 15; § 686).

Neither this court nor the United States Supreme Court has ever held the normal rules of evidence do not apply in the guilt phase of a capital case. (Cf. *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604, fn. 12 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954] [exclusion of irrelevant evidence at penalty phase].) Pursuant to Evidence Code section 240, a declarant who is "[e]xempted . . . on the ground of privilege from testifying" is " 'unavailable as a witness.' " Evidence Code section 1291, subdivision (a)(2) provides that evidence of the former testimony of an unavailable witness is not made inadmissible by the hearsay rule if "[t]he party against whom the former testimony is offered was a party to the . . . proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

In the instant case, Crenshaw, having invoked his privilege against self-incrimination, was unavailable as a witness. Defendant at the preliminary hearing had a full opportunity to cross-examine him and did so. (*People* v. *Maxwell, supra,* 94 Cal.App.3d at p. 571; see *People* v. *Salas* (1976) 58

---

[4] Crenshaw, like defendant, was charged in separate proceedings with the first degree murders of both Benham and White. In the White case he was convicted on his plea of guilty to a nonspecial circumstance first degree murder for which he was sentenced to 25 years to life. In the Benham case, pending at the time of this appeal, he initially was charged with capital murder, but the special circumstance allegation was subsequently dropped.

When called by the prosecution, Crenshaw invoked his Fifth Amendment privilege by refusing to answer all questions relating to his activities between the dates of March 19, 1981, and March 24, 1981. He testified briefly for the defense concerning his acquaintance with Laughlin, stating he knew Laughlin, he had been incarcerated with him, and Laughlin had told him he was an undercover policeman and wanted to help him.

Cal.App.3d 460, 468 [129 Cal.Rptr. 871].) Consequently, the statutory prerequisites to use of Crenshaw's preliminary hearing testimony were satisfied.

It is settled that where, as here, the witness is unavailable and the defendant at the preliminary hearing had the opportunity and similar interest and motive as at trial to cross-examine the witness, admission of the witness's former testimony does not violate the defendant's constitutional rights of confrontation and due process. (*Ohio* v. *Roberts* (1980) 448 U.S. 56, 68-70 [65 L.Ed.2d 597, 609-610, 100 S.Ct. 2531]; *People* v. *Hovey* (1988) 44 Cal.3d 543, 564 [244 Cal.Rptr. 121, 749 P.2d 776]; *People* v. *Enriquez* (1977) 19 Cal.3d 221, 235 [137 Cal.Rptr. 171, 561 P.2d 261, 3 A.L.R.4th 73].)

Defendant urges this court to preserve a defendant's confrontation rights by adopting a judicially declared rule of practice in capital cases (see *People* v. *Aranda* (1965) 63 Cal.2d 518, 530 [47 Cal.Rptr. 353, 407 P.2d 265]) that the former testimony of an accomplice who asserts his Fifth Amendment privilege is inadmissible at trial. In support, he argues that cross-examination at the preliminary hearing cannot compensate for lack of confrontation at trial because the nature and objective of the two proceedings differ significantly. (See *Barber* v. *Page* (1968) 390 U.S. 719, 725 [20 L.Ed.2d 255, 260, 88 S.Ct. 1318]; *People* v. *Stritzinger* (1983) 34 Cal.3d 505, 516 [194 Cal.Rptr. 431, 668 P.2d 738] [quoting *Barber*].) It is established, however, that competing interests "may warrant dispensing with confrontation at trial" (*Ohio* v. *Roberts, supra,* 448 U.S. at p. 64 [65 L.Ed.2d at p. 606]) and counterbalancing a defendant's interest in confrontation is the state's "strong interest in effective law enforcement." (*Ibid.*; see *People* v. *Ogen* (1985) 168 Cal.App.3d 611, 616 [215 Cal.Rptr. 16].) In permitting use of the former testimony of an unavailable witness, the courts have struck an appropriate balance between competing interests. (*Ohio* v. *Roberts, supra,* at pp. 64-66 [65 L.Ed.2d at pp. 606-608]; see also *Barber* v. *Page, supra,* 390 U.S. at p. 722 [20 L.Ed.2d at pp. 258-259].) We see no reason to strike a different balance in a capital case.

Defendant asserts that "trial-by-transcript" in a capital case, especially where the source of the transcript—an accomplice—has been recognized as inherently untrustworthy, contravenes basic notions of fairness and the need for heightened reliability in the fact-finding process that may lead to a defendant's death. The issue of Crenshaw's reliability, however, was fully presented to the jury through defense counsel's extensive cross-examination at the preliminary hearing, which, inter alia, disclosed that Crenshaw was awaiting trial on murder charges in the White case and on special circumstance murder charges in the present case; defense counsel's argument, which fully explored Crenshaw's accomplice status and possible motive to

lie; the prosecutor's acknowledgment that Crenshaw was trying to exculpate himself; and the court's instructions relating to accomplice testimony (e.g., CALJIC Nos. 3.11 [corroboration necessary], 3.12 [sufficiency of corroborating evidence], 3.18 [viewing testimony with distrust]). Nor was this a "trial by transcript": Crenshaw's former testimony was amply corroborated by the circumstantial evidence, the testimony of Laughlin that defendant admitted killing Benham and defendant's own testimony admitting he was present with Benham and that he robbed and kidnapped her. Use of the former testimony was not error.

## II. Special Circumstance Issues

### A. *Intent to Kill.*

The jury was instructed that to find the charged felony-murder special circumstances true it must find the murder was committed in the course or furtherance of the robbery and/or kidnapping for robbery, except, if defendant was not the actual killer, then it must find defendant intentionally aided or abetted the actual killer in the commission of the murder and "have intended that the killing take place." Relying on *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] and *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], overruled in *People* v. *Lee* (1987) 43 Cal.3d 666, 676 [238 Cal.Rptr. 406, 738 P.2d 752], defendant argues that the felony-murder special-circumstance findings must be set aside because the court erroneously instructed that intent to kill was required only if defendant were not the actual killer.

In *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306] we reconsidered our *Carlos* decision, *supra,* 35 Cal.3d 131. We concluded the court need instruct on intent to kill as an element of the felony-murder special circumstance only if there is evidence from which the jury could find the defendant was an accomplice rather than the actual killer. (43 Cal.3d at p. 1147.) The court's instructions were proper under *Anderson*.

Defendant maintains the principles of fair notice inherent in ex post facto and due process analysis prohibit the retroactive application of *Anderson*. We have recently considered and rejected this argument in *People* v. *Poggi* (1988) 45 Cal.3d 306, 326-327 [246 Cal.Rptr. 886, 753 P.2d 1082]. As in *Poggi,* defendant stands convicted of a murder that preceded our decision in *Carlos, supra,* 35 Cal.3d 131. *Carlos* itself concluded the statute was ambiguous with respect to the requirement of intent to kill for a felony-murder special circumstance. (See *Anderson, supra,* 43 Cal.3d at p. 1143.) We therefore reject defendant's fair-notice argument.

## B. *Prior-murder-conviction Special Circumstance.*

■ As proof of the prior-murder-conviction special-circumstance charge, the prosecutor introduced documentary evidence that in 1982 defendant was convicted of the first degree murder of White. Relying on *Carlos v. Superior Court, supra,* 35 Cal.3d 131 and *People v. Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669], defendant contends the prior-murder-conviction special circumstance must be set aside because there was no finding in either the present or prior case that he intended to kill.[5] Any contrary result, he maintains, would irrationally distinguish between defendants whose multiple murders were joined for trial (see *Turner, supra,* at pp. 328-329, requiring intent to kill in at least one of two joined felony murders) and those whose offenses were severed or, as here, jurisdictionally precluded from being jointly tried (§ 777; *People v. Bradford* (1976) 17 Cal.3d 8, 14 [130 Cal.Rptr. 129, 549 P.2d 1225]). Defendant also maintains the prior-murder-conviction special-circumstance finding is invalid because the underlying murder occurred subsequent to the present offense.

In *People v. Hendricks* (1987) 43 Cal.3d 584, 596 [238 Cal.Rptr. 66, 737 P.2d 1350], we held intent to kill is not an element of the prior-murder-conviction special circumstance. Defendant's concern that this holding irrationally distinguishes between defendants is answered by *Anderson, supra,* 43 Cal.3d 1104. In *Anderson* we rejected the reasoning of *Carlos, supra,* 35 Cal.3d 131, and *Turner, supra,* 37 Cal.3d 302, and determined intent to kill is not an element of the felony-murder or the multiple-murder special circumstance unless the defendant was an aider or abettor and not the actual killer. (43 Cal.3d at pp. 1147, 1149-1150.) As indicated, the jury in the instant case was instructed in compliance with *Anderson.* Thus, application of the prior-murder-conviction special circumstance to render defendant death-eligible results in no irrational distinction between defendants tried jointly and those whose offenses are separately tried.

Defendant's further contention that the prior murder must have preceded the present offense was rejected in *People v. Hendricks, supra,* 43 Cal.3d 584, 595-596. "The order of the commission of the homicides is immaterial." (*Id.* at p. 596.)

---

[5]To prove this point, defendant requests that we take judicial notice of the information filed against him in Riverside County in the White case. We deny the request on grounds the nature of the White charges is immaterial to resolution of the intent-to-kill issue, as will appear from our discussion.

## III. Penalty Phase Issues

### A. *Failure to Instruct on Informant's Testimony.*

Observing that jailmate Laughlin's testimony as to defendant's confession was "some of the most damning evidence" concerning defendant's role in the Benham crimes and the only direct evidence of his state of mind with respect to Benham's murder,[6] defendant asserts that in a capital case due process requires the court sua sponte to instruct the jury to view the testimony of an informant with caution. In *People* v. *Hovey, supra,* 44 Cal.3d 543, 565-566 we declined to impose a requirement of sua sponte cautionary instructions on informant testimony. We adhere to that ruling here.

### B. *Refusal to Re-voir Dire the Jury.*

After completion of the guilt phase of trial, defendant moved for a new jury pursuant to section 190.4, subdivision (c) or, in the alternative, that the jury be voir dired to determine if there were good cause why any juror could not sit in the penalty phase. Both motions were based on the assertion that in light of the inflammatory evidence presented at the guilt phase and the relatively short time it took the jury to reach a verdict (three to four hours), there was a likelihood the verdict was based on passion and the jury therefore could not approach the question of penalty with an open mind. The trial court denied the motions on grounds there was no legal basis for voir dire of the sitting jurors and a new jury would in any event hear the same evidence as the guilt phase jury.

Section 190.4, subdivision (c) provides in pertinent part: "If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, the same jury shall consider . . . the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn." Defendant maintains the authority to voir dire the jury is implicit in the section, as voir dire is the only meaningful way to determine whether the jurors could consider the penalty phase evidence with open minds and not automatically vote for death by reason of the passions engendered in the first phase of trial.

As we observed in *People* v. *Gates* (1987) 43 Cal.3d 1168, 1199 [240 Cal.Rptr. 666, 743 P.2d 301], there is no direct authority on the meaning of

---

[6] Laughlin testified defendant's reasons for robbing and killing Benham were based on the enjoyment and bizarre "sexual gratification" he receives from such acts and his wish to eliminate any "trails of live clues."

"good cause" in the context of impanelling a new penalty phase jury. Neither is there any authority concerning how good cause may be shown. Nevertheless, we believe that defendant's assertions of possible juror bias in this case, based on the inflammatory nature of the guilt phase evidence and the promptness of the verdict, were insufficient to impose any duty of inquiry on the court.

First, since the evidence in every capital case is likely to be somewhat inflammatory, defendant's argument, extended to its logical conclusion, would require the court routinely to re-voir dire the jury. This clearly is not the intent of the statute. (Cf. *People* v. *Balderas* (1985) 41 Cal.3d 144, 204-205 [222 Cal.Rptr. 184, 711 P.2d 480] [due process does not require separate penalty jury].) Second, as the trial court observed, the "inflammatory" guilt phase evidence would be presented to the penalty phase jury in any case. That the guilt phase jury initially heard the evidence without mitigating evidence is, like the admission of inflammatory evidence itself, common to all capital cases and thus cannot be sufficient cause for discharge.

In sum, defendant's showing raised no duty on the part of the court to question the jurors. (See *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1028-1029 [248 Cal.Rptr. 568, 755 P.2d 1017]; *People* v. *Gates, supra,* 43 Cal.3d at p. 1199.)

## C. *Evidentiary Errors.*

Observing that the jury spent more than a day in deliberations (six hours the first day, two hours the second) and requested the rereading of the testimony of three witnesses (Crenshaw, Laughlin and defendant), defendant maintains the jury found the choice of appropriate penalty to be a close question. Given this asserted delicate balance between evidence in favor of life and that in favor of death, defendant contends the following three evidentiary errors require reversal of the penalty verdict.

### 1. *Impeachment of Terry Caylor.*

At the penalty phase Caylor impeached Laughlin, the jailhouse informer who testified defendant had confessed to the Benham, White and Rankin murders. According to Caylor, Laughlin admitted he was lying about defendant's involvement; he stated he had an agreement with Crenshaw that he would testify against defendant and indicated his testimony would result in dismissal of the charges pending against him.

At the outset of direct examination defense counsel elicited from Caylor that he had previously been convicted of a felony, he was presently awaiting

trial on another matter, and he had previously been represented by defense counsel, but had discharged him so he could represent himself. On cross-examination the prosecutor elicited that Caylor had been convicted of the felonies of robbery, rape and lewd conduct; he was awaiting trial on an escape charge; he was representing himself; and he had escaped from Patton, a mental institution. Defense counsel failed to object.

Defendant contends that pursuant to *People* v. *Woodard* (1979) 23 Cal.3d 329, 335 [152 Cal.Rptr. 536, 590 P.2d 391], the prosecutor improperly impeached Caylor with the rape and lewd conduct convictions, which had no bearing on Caylor's truthfulness.

Because the charged crimes occurred prior to the adoption of Proposition 8, *Woodard* governs. (*People* v. *Smith, supra,* 34 Cal.3d 251.) Consequently, although the challenged evidence was related in general to matters raised on direct, had defense counsel objected admission of the evidence likely would have been error: neither the nature of Caylor's rape and lewd conduct convictions nor the nature of his pending escape charge (as distinguished from the fact he was in jail awaiting trial) had any bearing on his credibility (see *People* v. *Rist* (1976) 16 Cal.3d 211, 221 [127 Cal.Rptr. 457, 545 P.2d 833] [rape]; *People* v. *Holt* (1984) 37 Cal.3d 436, 454-455 [208 Cal.Rptr. 547, 690 P.2d 1207] [escape]) or any other identified issue, and the Attorney General has made no attempt to show how Caylor's mental problems or election to represent himself had any bearing on his testimony or ability to perceive the matters testified to (see Evid. Code, § 780, subd. (d)).

Although counsel's failure to object waives the issue in the context of evidentiary error (see Evid. Code, § 353), the issue is reviewable in the context of whether counsel provided ineffective assistance, discussed *post* at pages 33-34. (See *People* v. *Fosselman, supra,* 33 Cal.3d 572, 581.)

2. *Implied Existence of Uncalled Adverse Witnesses.*

██ Eugene Mazza, defendant's former manager in the newspaper delivery business, testified to defendant's reliability, conscientiousness and good character. On cross-examination the prosecutor asked if he "became aware that other persons had also been contacted for references," and if he would know "if some people were called and just didn't want to come in and testify?" Defendant maintains the sole purpose of this questioning was improperly to insinuate to the jury that there existed untold witnesses who knew defendant and were interviewed by the defense team, but had refused to speak on his behalf. (See *People* v. *Wagner* (1975) 13 Cal.3d 612, 619-620 [119 Cal.Rptr. 457, 532 P.2d 105]; cf. *People* v. *Bolton* (1979) 23 Cal.3d 208, 212 [152 Cal.Rptr. 141, 589 P.2d 396] [improper argument].)

The questions were improper. In light, however, of the 24 witnesses who in fact did testify in defendant's behalf, including friends, family, teachers, neighbors, counselors, a priest and a state court justice, the error manifestly was harmless under any standard. (Cf. *People* v. *Bolton, supra,* 23 Cal.3d at p. 214.)

3. *Prison Gang Activity and Appeal to Racial Prejudice.*

■ Defendant maintains that through the improper introduction of evidence of prison gang activity, the prosecutor appealed to racial prejudice and implied defendant's future dangerousness.

Defendant first cites the prosecutor's questions to a prison guard whether he was aware of gang activity at the prison and the existence of Black gangs that occasionally harmed White inmates. These questions were asked in the context of attempting to rehabilitate prosecution witness Smith, whose testimony concerning defendant's involvement in a jail sodomy had been impeached by the guard's testimony on direct that Smith had given inconsistent statements about the incident.[7]

The prosecutor's inquiry about gangs arguably was improper: although the prosecutor could show victim Smith's fear of retaliation, as in fact he did (see fn. 7, *ante*), absent a showing of gang involvement in the sodomy or gang practice (as opposed to individual or general inmate practice) to engage in retaliation, the existence of prison gangs and the harm done White inmates by Black gangs was irrelevant and potentially prejudicial. (Cf. *People* v. *Cardenas* (1982) 31 Cal.3d 897, 904-905 [184 Cal.Rptr. 165, 647 P.2d 569] [plur. opn.]; *People* v. *Perez* (1981) 114 Cal.App.3d 470 [170 Cal.Rptr. 619].) Defense counsel, however, failed to object. Because, in our opinion, a timely objection and admonition, when the district attorney first

---

[7] The relevant colloquy was as follows: "Q. Isn't it a fact, Captain, that on the second occasion when Mr. Smith spoke to you and wanted to implicate Mr. Malone, he expressed certain fear for his own safety?

"A. That's true.

"Q. Are you aware that there is gang activity at the State Prison?

"A. Yes, I am.

"Q. Are you aware that there are [B]lack gangs at the prison?

"A. Yes.

"Q. And that these [B]lack gangs will occasionally harm [W]hite inmates?

"A. Yes.

"Q. Is it not also true that a person who files a report, let's say a forcible sodomy, and points someone out, one or more individuals out, that that person has substantially increased his risk of harm or retaliation from other inmates?

". . . . . . . . . . . . . . . .

"The Witness: If he's not—if he's not protected from the other inmates, his chances of harm are substantially increased, yes."

asked about gang activity at the prison, would have cured the effect of any impropriety and have deterred further prosecutorial inquiry into such activity without a foundation showing its relevance, the issue is waived. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 758-759 [175 Cal.Rptr. 738, 631 P.2d 446].) This being so, the remaining question is whether defense counsel's failure to object constituted ineffective assistance, discussed *post* at pages 33-34.

■■■ Defendant next complains about the prosecutor's reference to prison gang activity in his cross-examination of psychologist Dr. Craig Rath, who had testified that defendant, under "very specific conditions,"[8] might mature in the structured prison environment, where life prisoners achieve a stable "status quo." The prosecutor asked Dr. Rath whether the "status quo" can often take the form of criminal activity by gangs and whether he was aware that often entree into a gang is achieved by killing another inmate. This evidence, defendant maintains, served only to raise the possibility of defendant's future dangerousness and thus was inadmissible as irrelevant to any aggravating factor. (*People* v. *Boyd* (1985) 38 Cal.3d 762, 773-776 [215 Cal.Rptr. 1, 700 P.2d 782]; see *People* v. *Murtishaw, supra,* 29 Cal.3d at pp. 767-768.)

Although evidence of future dangerousness is inadmissible in the prosecution's case-in-chief (*Boyd, supra,* 38 Cal.3d at pp. 775-776; *Murtishaw, supra,* 29 Cal.3d at pp. 767-768), such evidence may be introduced in rebuttal where, as here, the defense has raised the issue of defendant's performance in prison and has presented evidence he would live a law-abiding life in a prison environment (*Boyd, supra,* at p. 776).[9] (See *People* v. *Gates, supra,* 43 Cal.3d 1168, 1211; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 791 [230 Cal.Rptr. 667, 726 P.2d 113]; cf. *Jurek* v. *Texas* (1976) 428 U.S. 262, 274-276 [49 L.Ed.2d 929, 939-941, 96 S.Ct. 2950] [no constitutional impediment to evidence of future dangerousness].) Here, moreover, the evidence was directed not to defendant's future dangerousness as such, but rather to the nature of the prison environment—an environment the defense had sought to prove would foster defendant's maturity and stability. The questioning, as the Attorney General observes, served to cross-examine Dr. Rath on the impression he had left with the jury that prison was a tranquil place where defendant could get counseling and psychiatric care, which would enable him to control the impulsivity that had contributed to his past

---

[8] The "specific conditions," counsel described included a "structured setting . . . where he could go to school, where he might be able to get one-on-one counseling, where he might have the benefit of psychological intervention . . . ."

[9] The prosecutor objected when defense counsel asked Dr. Rath how defendant would perform in prison, but withdrew his objection when the court assured him that he would have "full latitude" in cross-examination.

criminal behavior. (See Evid. Code, §§ 721, subd. (a), 761; cf. *Brown* v. *Colm* (1974) 11 Cal.3d 639, 646 [114 Cal.Rptr. 128, 522 P.2d 688].)

4. *Denial of Due Process.*

Asserting that the prosecution's routine use of "professional snitches" like Laughlin to persuade juries in capital cases is disturbing of itself, defendant contends the prosecutor's further use in this case of improper means to destroy the credibility of the witness (Caylor) who showed Laughlin to be a liar constituted a denial of due process. As a further denial of due process, defendant cites the prosecutor's "gratuitous invocation of the image of [B]lack prison gangs attacking hapless [W]hites," an image that assertedly exploited the risk of racial prejudice inherent in this case, involving as it does a Black man convicted of killing a White woman in circumstances having sexual overtones.

 Defendant's due process argument rests on the premise the prosecutor engaged in deliberate misconduct. The record is to the contrary. During the guilt phase of trial, when the defense proposed to have defendant's cellmates impeach Laughlin, the prosecutor specifically noted he had no background information on the witnesses and assumed they had all been convicted of felonies. He asked for assurance there would be no motion for a mistrial if he inquired of that without having the necessary proof. Defense counsel acceded, stating, "I think they will freely admit that they are hardcore criminals." Thereafter the prosecutor, without objection, asked each of the inmate witnesses what felonies he had been convicted of; as to one prisoner, defense counsel did the same. On this record, and absent a showing of any different understanding at the penalty phase of trial, defendant's assertion of prosecutorial misconduct in cross-examination of Caylor is meritless.

Nor was the prosecutor's reference to Black gang activity misconduct. The reference was in the context of rehabilitating witness Smith who, according to the defense's prison-guard witness, had given prior inconsistent statements concerning defendant's involvement in the sodomy attack against him and had attributed his change of story to confusion and fear. Because defendant is Black and Smith evidently is White, the prosecutor could reasonably have believed the asserted attacks of Black gangs against White inmates were relevant to Smith's fear of retaliation if he testified against defendant.

We thus reject defendant's due process contentions.

5. *Waiver and Ineffective Assistance of Counsel.*

 Defendant maintains that if we determine counsel's failure to object waived the errors in admitting evidence of Terry Caylor's criminal background and of Black prison gang activity, such failure denied him the effective assistance of counsel.

 A defendant who on appeal asserts a claim of ineffective assistance has the burden to show counsel failed to perform as a reasonably competent attorney acting as a diligent advocate and that counsel's deficiencies prejudiced his case. (*People* v. *Pope, supra,* 23 Cal.3d 412, 425; *People* v. *Fosselman, supra,* 33 Cal.3d 572, 584; see *Strickland* v. *Washington, supra,* 466 U.S. 668; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-217 [233 Cal.Rptr. 404, 729 P.2d 839].) We have observed that a mere failure to object to evidence seldom establishes counsel's incompetence. (*People* v. *Ghent* (1987) 43 Cal.3d 739, 772 [239 Cal.Rptr. 82, 739 P.2d 1250].) Assuming arguendo, however, that a reasonably competent attorney would have objected to the challenged evidence and, further, that there could be no justifiable tactical reason for counsel's failure to object (cf. *Pope, supra,* at pp. 426, 428; *Ghent, supra,* at p. 773), defendant still must show counsel's omissions were prejudicial.

 Counsel's failure to prevent the improper impeachment of Caylor was prejudicial, defendant maintains, because Caylor's testimony, if believed, discredited Laughlin, whose testimony provided the only direct evidence defendant, and not Crawford, was the perpetrator of the crimes.[10] We disagree. Even without evidence of Caylor's felony convictions for rape and lewd conduct and his pending escape charges, the jury was aware that Caylor, like Laughlin himself, was a convicted felon awaiting trial on new charges. The specifics of his criminal history could not have made an appreciable difference. Indeed, arguably it was less prejudicial for the jury to know the nature of Caylor's priors and pending charges than to leave the question open to speculation. (Cf. *People* v. *Rollo* (1977) 20 Cal.3d 109, 119 [141 Cal.Rptr. 177, 569 P.2d 771].) During the guilt phase, moreover, the jury had heard and evidently rejected similar impeaching evidence concern-

---

[10] Defendant cites *People* v. *Sassounian* (1986) 182 Cal.App.3d 361 [226 Cal.Rptr. 880] as highlighting the importance and illustrating the truth of Caylor's testimony portraying Laughlin as a liar who manufactured evidence against defendant so he could testify against him in exchange for prosecutorial favors in his own case. In *Sassounian* the court cites testimony by Laughlin that he participated in a plan to incriminate Sassounian in return for anticipated prosecution favors and that he had repeatedly lied to "nearly every representative of law enforcement who contacted him in [the] case." (*Id*. at pp. 392-393.)

On cross-examination in this case Laughlin acknowledged he had testified in several other cases, but denied he received anything in exchange. The parties subsequently stipulated that the escape charges pending against Laughlin had been dismissed for insufficient evidence.

ing Laughlin's asserted manufacture of his testimony.[11] The details of Caylor's criminal background could not in the circumstances have been determinative of the jury's resolution of the issue of Laughlin's credibility.

Admission of evidence of Black prison gang activity, although arguably improper, likewise was nonprejudicial. As indicated, evidence of prison gang activity in general was properly admitted in the context of describing the environment defendant would interact with were he sentenced to life without possibility of parole, an issue raised by the defense. The single reference to Black gang activity occurred in the course of cross-examination of a prison guard about inmate Smith's fear of retaliation for reporting the sodomy attack. Dr. Rath, testifying for the defense concerning defendant's likely behavior in prison, twice stated that defendant is prone to be a "loner," not a gang joiner—thus neutralizing in part any prejudicial effect of the improper reference. Dr. Rath further testified that defendant is a sociopath with attention-deficit disorder whose problems of hyperactivity, irritability and impulsivity would continue to manifest themselves, and that it would be consistent with defendant's personality to try to escape. In light of the above testimony and the overwhelming aggravating evidence—particularly that during defendant's last escape from jail he engaged in a crime and murder spree that left four people dead, and immediately after his commitment to prison for the White murder he engaged in assaultive sexual behavior—the arguably improper reference to Black gangs could not have affected the verdict.

Throughout most of the lengthy trial, counsel performed as a vigorous and capable advocate. We conclude that even assuming counsel's failure to object to the challenged evidence was unreasonable, the prejudice defendant suffered, if any, does not warrant setting aside his death sentence. (*Strickland* v. *Washington, supra,* 466 U.S. at pp. 694-695, 698-699 [80 L.Ed.2d at pp. 698, 700-701]; *People* v. *Fosselman, supra,* 33 Cal.3d at p. 584; *People* v. *Pope, supra,* 23 Cal.3d at p. 423.)

D. *Excusing Crenshaw From Testifying.*

▪ Defendant's crime partner, Crenshaw, testified for the prosecution at the preliminary hearing, but invoked his privilege against self-incrimina-

---

[11] Three cellmates of defendant testified defendant made no statements to Laughlin in their presence and defendant was not "a talker." Defendant testified he never spoke to Laughlin about his case and Laughlin must have acquired his information by going through defendant's papers. The parties stipulated defendant had police reports in his possession which reflected the circumstances and investigations of many of the incidents that had been testified to during the trial. During his testimony, moreover, Laughlin admitted he was a witness in four other pending cases and that two of his pending charges had been dismissed.

tion when called by the prosecution at the guilt phase of trial, although he testified briefly for the defense. (*Ante*, fn. 4, p. 23.) At the penalty phase, defendant sought to call Crenshaw again, proposing to ask if he had shot White, the victim in the prior-murder special circumstance. The trial court, informed by Crenshaw's counsel he would instruct his client not to answer the question, ruled Crenshaw need not testify, based on the assumption he would invoke his privilege against self-incrimination if called. The court ruled further that "based on the offer of proof," the subject matter of Crenshaw's proposed testimony was either not relevant or could be proved by some other means. Defendant contends these rulings were error.

We first observe that defense counsel did not object to the challenged procedure, but rather, acquiesced in it; hence defendant may not complain on appeal. (*People* v. *Harris* (1979) 93 Cal.App.3d 103, 118 [155 Cal.Rptr. 472].) In any event, the court's ruling that Crenshaw need not take the stand to reassert his Fifth Amendment privilege was not error. Crenshaw had previously exercised the privilege as to all events between March 19, 1981, and March 24, 1981. (See *ante*, fn. 4, p. 23.) White's murder occurred during those dates. Crenshaw's counsel confirmed he would advise his client not to respond to the proposed question. In these circumstances, the court properly found there was no reason to have Crenshaw personally reassert the privilege.

None of the cases relied on by defendant is apposite because in none did the witness, as here, personally assert the privilege at trial. (E.g., *People* v. *Kynette* (1940) 15 Cal.2d 731, 747 [104 P.2d 794]; *People* v. *Harris, supra,* 93 Cal.App.3d at p. 117; see also *People* v. *Ford* (1988) 45 Cal.3d 431, 435-436 [247 Cal.Rptr. 121, 754 P.2d 168].) Although defendant would have us equate the separate phases of trial to separate "proceedings," so as to require a witness to invoke the privilege at each (see *People* v. *Kynette, supra*), we decline to do so.

Likewise meritless is defendant's argument that absent Crenshaw's actual reinvocation of the privilege at the penalty phase, the court was in no position to rule whether the privilege applied. Although Crenshaw, based on his guilty plea, had been convicted and sentenced for the White murder and evidently had failed to appeal (cf. *People* v. *Lopez* (1980) 110 Cal.App.3d 1010, 1021 [168 Cal.Rptr. 378] [privilege survives pending resolution of appeal]), thus rendering his conviction final, the same was true at the guilt phase.[12] In both instances, he had yet to be tried for the Benham

---

[12] At defendant's request, we have taken judicial notice of minute orders showing Crenshaw's nolo contendere plea to White's murder on November 5, 1982, and his sentencing on December 10, 1982, and of a March 3, 1988, letter of the court clerk stating that court records reveal no notice of appeal in the case. Because judgment against Crenshaw in the White

murder, in which trial it was more than likely the prosecution, as in defendant's trial, would seek to introduce evidence of the White murder for purposes of establishing Crenshaw's guilt. Because a response to defense counsel's question whether he shot White thus could lighten the district attorney's burden of proof, Crenshaw was privileged to refuse to answer. (See *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320, 326 [85 Cal.Rptr. 129, 466 P.2d 673].)

We conclude, therefore, the court did not err in determining Crenshaw's invocation of the privilege extended to the defense's proposed penalty phase question. (See *People* v. *Ford, supra,* 45 Cal.3d at p. 441.) Nor did the court err in its relevance and other-means-of-proof ruling. The record discloses this ruling was directed not to the question whether Crenshaw had shot White, but rather, to matters presented in defense counsel's "offer of proof" and subsequently proved by documentary evidence—Crenshaw's sentence in the White murder (25 years to life) and the charges pending against him in the Benham case (nonspecial circumstance murder). As to these, the court's ruling was proper.

E. *Prosecutorial Misconduct.*

1. *Argument Concerning Unproved Sex Crimes.*

 As part of the special circumstance allegations, defendant was originally charged with having killed Benham in the course of rape and sodomy (§ 190.2, subd. (a)(17)(iii) and (iv)). The two special circumstances ultimately were dismissed on grounds, inter alia, that there was insufficient corroboration of Crenshaw's statements implicating defendant in the crimes. In his penalty phase argument, however, the prosecutor described Benham as having been "sexually assaulted." Defendant maintains the prosecutor thereby improperly submitted the rape and sodomy offenses to the jury as aggravating "other crimes" (see § 190.3, factor (b)) when there was insufficient evidence to permit the offenses to be considered (*People* v. *Robertson* (1982) 33 Cal.3d 21, 53-54 [188 Cal.Rptr. 77, 655 P.2d 279]; *People* v. *Boyd, supra,* 38 Cal.3d 762, 774) and impermissibly attempted to relitigate the court's prior finding of insufficient evidence (see *People* v. *Haskett* (1982) 30 Cal.3d 841, 866-867 [180 Cal.Rptr. 640, 640 P.2d 776]).

Because defense counsel failed to object to the prosecutor's comments, defendant can complain on appeal only if timely objection and admonition

case was entered more than three months before he invoked his Fifth Amendment privilege at the guilt phase of trial and no appeal was taken, the conviction was final at that time. (See Cal. Rules of Court, rule 31(d).)

could not have obviated the prejudicial effects of the remarks. (*People* v. *Haskett, supra,* 30 Cal.3d 841, 860-861; *People* v. *Green, supra,* 27 Cal.3d 1, 34.) We are of the view that any harmful effect from the remarks could have been cured by an objection and admonition when the prosecutor first made the challenged reference to a "sexual assault."

We further conclude, however, the prosecutor's comments were not error. Sexual assault is not a specific crime, nor was it listed among the "other crimes" the court instructed the jury it could consider.[13] In lay terms an assault is an unwanted touching or a threat to accomplish such; by the same token, a sexual assault is an unwanted sexual advance—i.e., an unwanted touching or threat to touch an intimate body part.[14] (Cf. §§ 240 [assault], 243.4 [sexual battery].) Defendant's sexual assault of Benham was a circumstance of the crime (§ 190.3, factor (a)), as shown by evidence that she was lying in a face down position, nude below the waist, and Crenshaw's testimony that defendant was on top of her with his pants down. ▮ We do not believe corroboration is required for that part of an accomplice's testimony that relates to the circumstances of the crime, rather than commission of a specific offense. (See § 1111 [distinguishing corroboration connecting defendant to commission of the offense from that directed only to its circumstances]; *People* v. *Szeto* (1981) 29 Cal.3d 20, 27 [171 Cal.Rptr. 652, 623 P.2d 213] [corroboration need not establish every fact of the crime].) ▮ Assuming, arguendo, however, that corroboration is required for the circumstance to be used in aggravation of penalty, the sexual assault aspect of Crenshaw's testimony was sufficiently corroborated by the position and unclothed condition of Benham's body and Laughlin's testimony that defendant received some form of sexual gratification from killing people. (See *People* v. *Szeto, supra,* 29 Cal.3d 20 [corroborative evidence may be slight].)

The prosecutor's references to the sexual assault were made not in the context of defendant's other criminal activity, but rather, in the context of

---

[13] The court instructed the jury that it could consider the following "alleged acts of the defendant which may constitute criminal activity and prior convictions of felonies suffered by the defendant." The court then listed (1) the murder of White; (2) the murder of William Parr; (3) the murder of Rankin; (4) the kidnapping of Rankin; (5) the robbery of Michael Buss; (6) the kidnapping of Combs; (7) defendant's prior conviction of first degree murder; (8) defendant's prior conviction of robbery; and (9) the forcible sodomy of Smith.

The court then instructed the jury that the defendant was presumed not to have committed any of the foregoing acts and that it could consider such acts in aggravation only if it first determined the defendant had been shown beyond a reasonable doubt to have committed the acts or had been convicted of the prior felonies.

[14] Webster's Dictionary defines "assault" in part as follows: "a violent attack with physical means . . . . An apparently violent attempt . . . to do hurt to another without the actual doing of the hurt threatened . . . RAPE: Indecent attack or overture forcibly effected." (Webster's New Internat. Dict. (3d ed. 1961) p. 130, col. 3.)

the circumstances of the crime and defendant's capacity to conform his behavior to the law. As such, they were not improper.

### 2. *Insinuation of Additional Murder.*

■■■ In cross-examining defendant during the guilt phase about his kidnapping of Combs, the prosecutor asked if he had told Combs he killed someone earlier that day for doing something stupid. Defendant denied having made such a statement; on the prosecutor's further inquiry whether he had heard Combs testify to the statement in defendant's Riverside trial, defendant stated he did not recall. Although defendant did not object at trial, he now asserts the prosecutor deliberately left the jury with the unproven suggestion he committed an additional murder, thereby committing prejudicial misconduct requiring penalty reversal. (*People v. Evans* (1952) 39 Cal.2d 242, 248-249 [246 P.2d 636]; see *People v. Wagner, supra,* 13 Cal.3d 612, 619-620.)

Assuming arguendo defendant has not waived the asserted misconduct by failure to object or request an admonition (cf. *People v. Baines* (1981) 30 Cal.3d 143, 149 [177 Cal.Rptr. 861, 635 P.2d 455]), we conclude the questions were not prejudicial error. The asserted basis for the prosecutor's question was Combs's testimony at defendant's previous trial. Combs's testimony was subsequently read to the jury. In it—contrary to the prosecutor's question—Combs never attributed such a statement to defendant; hence the prior testimony would have tended to mitigate any harmful effect.

Moreover, in light of the overwhelming aggravating evidence, including evidence of defendant's three other murders in addition to the Benham killing, any implication that defendant may have committed an additional murder must have been harmless under any standard. (Cf. *People v. Bolton, supra,* 23 Cal.3d at p. 214.).

### 3. *Sympathy for Victims.*

■■■ Relying on *Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], defendant argues the prosecutor's request that the jury consider the feelings of William Parr (whose murder was proved as a factor (b) "other crime" [§ 190.3, factor (b)]) and his family constituted federal constitutional error. Assuming arguendo *Booth* applies to factor (b) crimes, that case, involving introduction into *evidence* of an extensive victim impact statement, is patently distinguishable from the instant case involving the prosecutor's *argument*. In the instant case the prosecutor merely asked the

jury to "consider the feelings of Mr. William Parr and his family. . . ." He acknowledged "we don't know" who his family and friends are, but asked the jury to think about "[h]ow many people cried in the William Parr household the day he was murdered by the defendant?"

The prosecutor's remarks were brief and mild, making only passing reference to the feelings of unknown persons who may have been affected by Parr's death. In the circumstances, any error in the comments was harmless beyond a reasonable doubt. (*People* v. *Miranda, supra,* 44 Cal.3d 57, 113; *People* v. *Ghent, supra,* 43 Cal.3d 739, 772.)

F. *Jury Instructions.*

1. *Instructions on Mitigation, Discretion and Sympathy.*

The court instructed the jury in terms of former CALJIC No. 8.84.1,[15] without clarifying that section 190.3 factor (k) permits the jury to consider any aspect of the defendant's character or record as mitigating evidence, and instructed it pursuant to a modified version of former CALJIC No. 8.84.2,[16] without clarifying that it could assign whatever moral or sympa-

---

[15]Former CALJIC No. 8.84.1, as modified and given, provides: "In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if applicable: (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

". . . . . . . . . . . . . . .

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect.

"(i) The age of the defendant at the time of the crime.

"(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (Omitted material [§ 190.3, factor (e)] deleted by the court.)

[16]Former CALJIC No. 8.84.2, as modified and given by the court, provides: "It is now your duty to determine which of the two penalties, death or confinement in the State Prison for life without possibility of parole, shall be imposed on the defendant. [¶] After having

thetic value it deemed appropriate to each of the various factors, including an expanded factor (k), and that it was required to determine if death was the "appropriate punishment" notwithstanding that aggravating factors may outweigh mitigating. (See *People* v. *Easley* (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813]; *People* v. *Brown* (1985) 40 Cal.3d 512, 540-541 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds, *California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].) Pursuant to a modified version of CALJIC No. 17.31,[17] the jury was also instructed to consider any guilt phase instruction it felt appropriate, without excluding CALJIC No. 1.00, the "antisympathy" instruction.[18] Defendant maintains that together these instructions precluded the jury from giving mitigating effect to his background and character evidence and misled it into believing sympathy and mercy were improper considerations in determining penalty.

 A defendant is entitled to have the jury consider in mitigation any background and character evidence he proffers as a basis for a sentence less than death (see *Lockett* v. *Ohio, supra,* 438 U.S. 586; *People* v. *Easley, supra,* 34 Cal.3d at p. 878, fn. 10) and, in weighing the aggravating and mitigating evidence, assign whatever moral or sympathetic value it deems appropriate to each of the relevant factors, including the mitigating evidence (*People* v.

---

heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider[,] take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you *may* impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the State Prison for life without the possibility of parole." (Italics denotes modification.)

[17] The court instructed the jury as follows: "During the first phase of the proceedings and before the issue of guilt or innocence was submitted to you for your deliberations, the Court read to you all instructions of law applicable and necessary for you to reach a verdict. Some or all of those instructions may be applicable and necessary for you to reach a verdict in this phase of the trial dealing with the issue of penalty and you are to consider those instructions *as you find them applicable.* [¶] *Whether some of those previously read instructions and the instructions I am now reading* to you will apply will depend upon your determination of the facts. You will disregard any instruction which applies to a state of facts which you determine does not exist. You must not conclude from the fact that an instruction has been given that the Court is expressing an opinion as to the facts."

[18] CALJIC No. 1.00 provides in pertinent part: "As jurors you must not be influenced by pity for a defendant or by prejudice against him. You must not be biased against the defendant because he has been arrested for this offense, or because he has been charged with a crime, or because he has been brought to trial. None of these circumstances is evidence of his guilt and you must not infer or assume from any or all of them that he is more likely to be guilty than innocent.

"You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict regardless of what the consequences of such verdict may be."

*Brown, supra,* 40 Cal.3d at p. 541). We have determined that section 190.3 satisfies these constitutional mandates. (*Brown, supra,* at pp. 540-541; cf. *Easley, supra,* at pp. 877-878.) However, in order to avoid any potential misunderstanding, we have imposed the prospective requirement that trial courts expressly inform the jury it may consider defendant's character and background evidence *(Easley, supra,* at p. 878, fn. 10) and fully instruct it as to the scope of its sentencing discretion and responsibility in accordance with the foregoing principles (*Brown, supra,* at p. 544, fn. 17).

In reviewing cases tried before *Easley, supra,* 34 Cal.3d 858, and *Brown, supra,* 40 Cal.3d 512, our task is to determine whether in context the jury may have been misled to defendant's prejudice concerning the mitigating evidence it could consider and the scope of its sentencing discretion. (*Brown, supra,* 40 Cal.3d at p. 544, fn. 17; see *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 786; see also *California* v. *Brown, supra,* 479 U.S. 538, 546 [93 L.Ed.2d 934, 943] (conc. opn. by O'Connor, J.).) In conducting such an examination we look to " 'the totality of the penalty instructions given and the nature of the arguments made to the jury.' " (*People* v. *Rodriguez, supra,* at p. 786.)

*Sympathy.* In the instant case there is nothing in the court's instructions or the prosecutor's argument to suggest to the jury it should not consider defendant's mitigating evidence. To the contrary, the court instructed the jury, in reaching its penalty determination, to consider "all of the evidence which has been received during any part of the trial . . . except as you may be hereafter instructed." Twenty-four defense witnesses testified to defendant's background and character. The prosecutor, moreover, stated that "We can feel sorry for Mr. Malone. And you will be instructed you can consider sympathy for Mr. Malone." Although no express sympathy instruction was given, this remark would certainly direct the jury's attention to the sympathetic aspects of defendant's background evidence and reinforce the mitigating effect of the section 190.3 factor (k) instruction. Defense counsel, in turn, emphasized the jury's duty to consider the nature of the offense and *the offender* in making its penalty determination and argued at length the mitigating effect of defendant's difficult childhood and upbringing, his need for counseling he did not receive, the love family members had for him, and his good qualities as testified to by friends, family members and a priest. Counsel expressly informed the jury it could take into consideration sympathy for defendant and for his family and that it had the power to extend mercy to him.

As we observed in *People* v. *Gates, supra,* 43 Cal.3d 1168, 1200, "It would defy all logic and reason to conclude that the jury which heard seven witnesses testify concerning the defendant's background and character, was

directed to consider 'all of the evidence,' and heard defense counsel argue this evidence at length, would somehow have concluded that it could not consider this testimony in its penalty determination." A fortiori, the same is true here.

On this record, the court's instruction to the jury to consider any guilt phase instruction it felt appropriate, without excluding CALJIC 1.00, the "antisympathy" instruction, was insufficient to mislead the jury concerning its duty to consider and give defendant's mitigating evidence whatever sympathetic value it believed appropriate. We recently have held that although the giving of an antisympathy instruction at the penalty phase is not error, the instruction nevertheless should not be given because in certain cases it might mislead jurors to the defendant's prejudice. (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 152 & fn. 7 [249 Cal.Rptr. 320, 756 P.2d 1348].) Here none was given. In light of the specific penalty phase instructions given, including section 190.3 factor (k), and the evidence and arguments presented, as discussed above, a reasonable jury would not have been misled into believing the guilt phase antisympathy instruction would continue to apply.

*Scope of Discretion.* Although it is not error per se for the court to instruct the jury in terms of former CALJIC No. 8.84.2 (*People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17), in the instant case the trial court nevertheless modified the instruction to direct the jury that "If you conclude the aggravating circumstances outweigh the mitigating circumstances, you *may* impose a sentence of death." (Italics added; see *ante*, fn. 16, p. 39.) The prosecutor informed the jury if it found the aggravating circumstances to outweigh the mitigating circumstances, it had "the option" of voting for the death penalty, and expressed his belief that after the jury had evaluated the aggravating and mitigating circumstances it would find "the penalty that is appropriate in this case." Defense counsel reiterated that even if the jury thought aggravating circumstances outweighed mitigating ones, it was "still not required by law to execute [defendant]." In addition counsel emphasized the jury was free to assign whatever weight it felt appropriate to any given factor and that it "emphatically" is not a question of mere numbers—"the law says weigh, not add." Any single factor could be sufficient to justify a life sentence, he argued. "You alone have to decide what weight to give each factor." And, he admonished the jury, "in weighing mitigation against aggravation, you want to be very certain, very certain that if you vote for death that death is the only appropriate sentence in this case."

We conclude that on this record the jury could not have been misled as to the factors it could consider or the scope of its discretion in determining

penalty. (See *People* v. *Miranda, supra,* 44 Cal.3d 57, 104; *People* v. *Gates, supra,* 43 Cal.3d 1168, 1200; *People* v. *Allen, supra,* 42 Cal.3d 1222, 1280.)

2. *Instruction to Disregard the Consequences.*

At the guilt phase of trial, the jury was instructed pursuant to CALJIC No. 1.00 that it should "reach a just verdict regardless of what the consequences of such verdict may be." Here, as with the antisympathy instruction discussed above, defendant argues the court committed reversible error in permitting the jury, by virtue of its "carry-forward" version of CALJIC No. 17.31 (*ante,* fn. 17, p. 40), to apply this instruction to the penalty phase.

■■ Although it may not be error to instruct the penalty phase jury to disregard the consequences of its decision (see *People* v. *Hamilton, supra,* 46 Cal.3d at p. 152; *People* v. *Lucky* (1988) 45 Cal.3d 259, 297-298 [247 Cal.Rptr. 1, 753 P.2d 1052]; *People* v. *Melton* (1988) 44 Cal.3d 713, 759, fn. 20 [244 Cal.Rptr. 867, 750 P.2d 741]), we nevertheless have held this portion of CALJIC No. 1.00, like the antisympathy direction, should not be given. (*People* v. *Wade* (1988) 44 Cal.3d 975, 998 [244 Cal.Rptr. 905, 750 P.2d 794]; *People* v. *Howard* (1988) 44 Cal.3d 375, 443 [243 Cal.Rptr. 842, 749 P.2d 279].) In the instant case, as indicated, the court instructed the jury to apply whichever of the guilt phase instructions it should find to be applicable depending upon its "determination of the facts" and to disregard those that applied "to a state of facts [it] determine[d] does not exist." We reject defendant's premise that in following this instruction the jury would have believed the guilt phase admonition to disregard the consequences of its verdict was applicable to its penalty decision. First, the court's instruction by its terms was restricted to previous instructions that bear on the jury's finding of *facts*. CALJIC No. 1.00, by contrast, is unrelated to any particular "state of facts" the jury might find, but rather, is directed to the jury's responsibility in reaching a verdict once it has found the facts and applied the law, as instructed by the court; hence it is not such an instruction as the jury would believe carried forward.

Second, both the prosecutor and defense counsel emphasized to the jury the significance and gravity of its decision. The prosecutor stated that determining the penalty to be death is "not done in a light vein." Defense counsel repeatedly referred to the jury's ultimate responsibility and spoke of the law's insistence life not be taken lightly and its sensitivity in this area because "you are dealing with Kelvin's life." Counsel admonished the jury that each one had an individual responsibility to be absolutely certain of his or her decision and to remember that if the verdict is death, "you are sending somebody to the gas chamber." "The truth is," he observed, "when you decide to kill a person, . . . you can't fully see the consequences of your

decision. You can't know what toll it will ultimately take on any of us. [¶] I imagine what the toll might be on Kelvin Malone, but you can't imagine what the toll will be on his family, on you, even on me."

We conclude the jury could not have believed that in reaching its penalty verdict it was to disregard the consequences of its decision. (See *People* v. *Babbitt, supra,* 45 Cal.3d 660, 718.)

### 3. *Artificial Inflation of Aggravating Circumstances.*

Among other factors, the jury was instructed to consider "(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true. . . . [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence. [¶] (c) The presence or absence of any prior felony conviction." Relying on *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433] (plur. opn.), defendant contends this language improperly required the jury to translate single aggravating acts of defendant into multiple aggravating factors, thus artificially inflating the case for death.

### a. *Overlapping Felony-murder Special Circumstances.*

The jury found true two felony-murder special circumstances: robbery-murder and kidnapping-for-purposes-of-robbery murder. (§ 190.2, subd. (a)(17)(i) and (ii).) Defendant argues the two felonies necessarily overlap because they describe an indivisible course of conduct having one principal criminal purpose: the robbery of Benham. Consequently, he contends that under *People* v. *Harris, supra,* 36 Cal.3d 36, it was error to instruct the jury to consider each as a distinct aggravating factor under subdivision (a).

In *Harris, supra,* 36 Cal.3d 36, a plurality of this court held that in cases where there have been alleged and found true multiple felony-murder special circumstances based on an indivisible course of conduct having one principal criminal purpose, the jury should be instructed that for purposes of determining penalty the multiple special circumstances should be considered as one. (*Id.* at p. 66.) The *Harris* court reached this conclusion in the belief that to permit the jury to take into account all of such multiple felony-murder special circumstances would artificially inflate the defendant's conduct and undercut the "constitutionally mandated objective of focusing on the particularized circumstances of the crime and the defendant." (*Id.* at p. 62.) The plurality further suggested that separate consideration of such

"overlapping" special circumstances at the penalty phase would violate "[t]he principles underlying California's prohibition of double punishment." (*Id.* at p. 64; see § 654.)

In *People* v. *Melton, supra,* 44 Cal.3d 713 we reconsidered *Harris.* We determined there was no constitutional impediment to permitting the jury to consider multiple felonies leading to the capital murder (*id.* at p. 767), so long as the various felonies are not weighed in the penalty determination "*more than once* for exactly the same purpose" (*id.* at p. 768, italics in original).[19] As we there observed, "it is constitutionally legitimate for the state to determine that a death-eligible murderer is more culpable, and thus more deserving of death, if he not only robbed the victim but committed an additional and separate felonious act, burglary [or, as here, kidnapping], in order to facilitate the robbery and murder." (*Id.* at p. 767; accord, *People* v. *Bean* (1988) 46 Cal.3d 919, 954-955 [760 P.2d 996].) Each of the crimes underlying the felony murder special circumstances invades a "distinct interest that society seeks to protect." (*Bean, supra;* accord, *People* v. *Poggi, supra,* 45 Cal.3d at p. 340.)

In the instant case the jury was properly permitted to consider both the robbery special circumstance and the kidnapping-for-robbery special circumstance as aggravating factors under section 190.3 factor (a).

b. *Multiple Use of Underlying Crime.*

Defendant argues the instructions permitted the jury to consider the robbery and kidnapping of Benham as aggravating circumstances under both factors (a) and (b).

It is settled that factors (b) and (c) of section 190.3 pertain only to criminal activity other than the crimes for which the defendant was convicted in the present proceeding. (*People* v. *Miranda, supra,* 44 Cal.3d 57, 105-106.) Although in *Miranda, supra,* we expressed doubt that a jury would believe factors (b) and (c) embrace the guilt phase offenses, in order to avoid any possible confusion, we directed trial courts in the future to expressly instruct that factors (b) and (c) refer to crimes other than those underlying the guilt determination. (44 Cal.3d at p. 106, fn. 28.)

---

[19] As we recognized in *Melton, supra,* "The literal language of subdivision (a) [factor (a)] presents a theoretical problem in this respect [of impermissible duplicative use], since it tells the penalty jury to consider the 'circumstances' of the capital crime *and* any attendant statutory 'special circumstances.' Since the latter are a subset of the former, a jury given no clarifying instructions might conceivably double-count any 'circumstances' which were also 'special circumstances.' On defendant's request, the trial court should admonish the jury not to do so." (44 Cal.3d at pp. 768-769, italics in original.) In the present case defendant does not raise this theoretical problem.

In the case at bench, there could have been no confusion concerning consideration of the guilt phase robbery and kidnapping crimes as section 190.3 factor (b) criminal activity. The trial court specifically instructed the jury as to which of defendant's alleged criminal acts could constitute "criminal activity" and prior felony convictions (*ante*, fn. 13, p. 37); the guilt phase crimes were not among them.

### c. Multiple Use of Prior-murder-conviction Special Circumstance.

The jury was required to consider the murder of White—the murder underlying the prior-murder-conviction special circumstance—under section 190.3 factor (a). In addition, the court in its list of possible other criminal activity and prior felony convictions permitted the jury to consider the murder twice more—once as "The murder of Minnie Ola White," and once as "Defendant's prior conviction of First Degree Murder." (See *ante*, fn. 13, p. 37.) Asserting that each of the factors is intended to be exclusive, defendant argues the court erred in permitting a "triple counting" of the White murder.

We have previously rejected the claim that the statutory factors are necessarily exclusive. Although factors (b) and (c) pertain only to criminal activity other than the crimes for which the defendant is convicted in the present proceeding (*People* v. *Miranda, supra,* 44 Cal.3d at pp. 105-106), a prior felony conviction that involves a crime of violence can be considered under both factors (b) and (c) (*People* v. *Melton, supra,* 44 Cal.3d at pp. 764-765). The only limitation is that "an individual criminal act cannot be counted twice in aggravation *for the same purpose.*" (*Id.* at p. 765, italics in original.)

The purpose of the prior-murder-conviction special circumstance is "to circumscribe, as the Eighth Amendment requires [citation], the classes of persons who may properly be subject to the death penalty. . . . Unlike recidivism statutes, . . . section 190.2(a)(2) is directed neither to deterring misconduct nor to fostering rehabilitation." (*People* v. *Hendricks, supra,* 43 Cal.3d 584, 595.) The purpose of section 190.3 factor (b), by contrast, is to show defendant's propensity for violence. And the purpose of factor (c) is to show the capital offense was the culmination of the defendant's habitual criminality—that it was undeterred by the community's previous criminal sanctions. (*People* v. *Melton, supra,* 44 Cal.3d at p. 764, quoting *People* v. *Balderas, supra,* 41 Cal.3d at p. 202.) Given these distinct purposes, there is no constitutional impediment to consideration of a defendant's prior-murder conviction under factors (a), (b) and (c).

In the instant case, because the murder of White involved force and violence, it could properly be considered under factor (b). (*People* v. *Melton,*

*supra,* 44 Cal.3d at p. 764.) Had the conviction occurred before the instant offense, it could also be considered under factor (c). But because the conviction occurred after commission of the instant offense, the court erred in permitting the jury to consider it as a "prior felony conviction" under factor (c). (*People* v. *Balderas, supra,* 41 Cal.3d 144, 203; see *Melton, supra.*)

The error, however, clearly was nonprejudicial. Nothing in the argument of either party underscored multiple consideration of the prior conviction. The prosecutor never enumerated the statutory factors as such; he merely discussed defendant's prior criminal activity and convictions in general, without reference to their relevance to a particular factor or factors. Neither did he indicate to the jury that it was to "count" aggravating factors. Rather, both he and defense counsel spoke of the jury's responsibility to "weigh" aggravating and mitigating factors. The jury was fully aware of defendant's first degree murder conviction for the killing of White, as well as the circumstances surrounding the killing. Nothing in the trial, the instructions or the argument was calculated to lead the jury to believe the White murder was more heinous because it came within three, rather than two, factors. We thus conclude the error in instructing the jury concerning application of section 190.3 factor (c) to the special circumstance murder could have had no bearing on its penalty verdict.

4. *Refusal to Delete Inapplicable Mitigating Factors.*

At the conclusion of the penalty phase, the jury was given the standard instruction to consider, "if applicable," each of the statutory mitigating and aggravating factors, except the court deleted factor (e) (victim's participation or consent).[20] (§ 190.3; see CALJIC No. 8.84.1.) Defendant argues the court was required to delete factors (f), (g) and (h) from the instructions, as inapplicable to this case. As we recently made clear in *People* v. *Miranda, supra,* 44 Cal.3d 57, 104-105 (1978 law) and *People* v. *Ghent, supra,* 43 Cal.3d 739, 776-777 (1977 law), however, deletion of inapplicable mitigating factors is not required.

G. *Reversal for One Invalid Special Circumstance.*

Defendant argues that if we determine any one of the three special circumstances is invalid, the penalty verdict must be reversed. We have concluded each of the special circumstance findings is valid. We therefore need not address this issue.

---

[20] The court also modified factor (h) by deleting reference to the effects of intoxication.

## H. *Unadjudicated Other-crimes Evidence.*

██ As evidence in aggravation the prosecutor introduced defendant's prior robbery conviction and evidence of four unadjudicated criminal acts involving violence (§ 190.3, factor (b)): the murder of Parr, the murder of Rankin, the sodomy of inmate Smith and the robbery of Buss. Defendant maintains the introduction of unadjudicated criminal conduct at the penalty phase constitutes a denial of due process. He recognizes we rejected this contention in *People* v. *Balderas, supra,* 41 Cal.3d 144, 204-205, but asks that we reconsider our decision. Because defendant provides no compelling reasons or new argument to justify reconsideration of *Balderas,* we decline to do so.

Defendant also maintains the trial court erred in not instructing the jury in the penalty phase that it must be unanimous in a finding that other crimes occurred. We recently rejected the identical contention in *People* v. *Ghent, supra,* 43 Cal.3d 739, 773-774.

## I. *Beeman Error.*

At the guilt phase the trial court instructed the jury on aiding and abetting in terms of the pre-*Beeman* (*People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318]) version of CALJIC Nos. 3.00 and 3.01.[21] The court gave no aiding and abetting instructions at the penalty phase, but instructed the jury to use whatever guilt phase instructions it found applicable and, with respect to defendant's alleged act of sodomy on Smith, expressly instructed that aiding and abetting principles applied.[22]

Defendant recognizes the court has no sua sponte duty to instruct the jury on the elements of unadjudicated other crimes offered in aggravation at

---

[21] The court instructed the jury that a person who, "with knowledge of the unlawful purpose of the person who directly and actively commits the crime," aids and abets in its commission is regarded by law as a principal and is equally guilty as one who directly and actively commits the crime and that "[a] person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator . . . he aids, promotes, encourages or instigates by act or advice the commission of such crime."

[22] The court instructed the jury as follows: "Any person who, while voluntarily acting in concert with another person, either personally or by aiding and abetting such other person, commits an act of sodomy against the will of the victim by means of force or fear of immediate and unlawful bodily injury to the victim has committed the crime of sodomy.

"It is not necessary that a person who aids and abets the perpetrator have physical contact with the victim.

"As used in this instruction, the phrase 'acted in concert' means two or more persons acting together in a group or gang sexual attack and includes not only those who personally engage in the act constituting the crime but also those present who aid and abet a person in accomplishing it. To establish that a person voluntarily acted in concert with another person, it is not necessary to prove there was any prearrangement, planning or scheme."

the penalty phase. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 281 [221 Cal.Rptr. 794, 710 P.2d 861].) He maintains that regardless of the trial court's sua sponte duty, any instructions it does give must be accurate. (*People* v. *Martinez* (1984) 157 Cal.App.3d 660, 670 [203 Cal.Rptr. 833] and cases cited.) Because the evidence showed defendant's only liability for the sodomy of Smith would be as an aider and abettor, defendant asserts that the court's failure accurately to instruct the jury on the intent element of aiding and abetting constitutes reversible penalty phase error.[23] (*People* v. *Croy* (1985) 41 Cal.3d 1 [221 Cal.Rptr. 592, 710 P.2d 392]; *People* v. *Garcia, supra,* 36 Cal.3d 539.)

In *Davenport, supra,* a plurality of this court stated that "the cases do not prohibit a trial court from instructing on the elements of other crimes offered as aggravating factors in an appropriate case where either the defendant or the prosecution requests such instruction or the court itself determines such instruction is vital to a proper consideration of the evidence. [Citations.] Normally, a defendant's failure to request instruction on the elements of the other-crimes aggravating evidence will preclude him from raising the issue on appeal [citation] and appellant's claim is thus not properly before us." (41 Cal.3d at pp. 281-282.) In the case at bench, because the court undertook to instruct the jury that aiding and abetting principles would apply to the alleged sodomy and had earlier instructed it on those principles, a "proper consideration of the evidence" (*Davenport, supra*) required that the instructions given be accurate. Although *Beeman, supra,* 35 Cal.3d 547, was decided after this case was tried, its holding applies retroactively. (*People* v. *Croy, supra,* 41 Cal.3d at p. 12.)

■■■ The question is whether the inaccuracy in the instructions was prejudicial. In *People* v. *Dyer* (1988) 45 Cal.3d 26, 64 [246 Cal.Rptr. 209, 753 P.2d 1], we determined the appropriate standard of review for *Beeman* error after *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101], and *Pope* v. *Illinois* (1987) 481 U.S. 497 [95 L.Ed.2d 439, 107 S.Ct. 1918], is the *Chapman* harmless error rule (*Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]). Applying the *Chapman* standard, it appears the *Beeman* error was harmless. The instructions as given required that an aider and abettor have acted with knowledge of the perpetrator's unlawful purpose; hence one aspect of defendant's mental state was before the jury. (See *People* v. *Croy, supra,* 41 Cal.3d at pp. 13-14.) According to the prosecution's evidence, defendant participated in the sodomy as an instigator with full knowledge and intent that the act occur. Defendant's defense, by contrast, was essentially a denial of any participation in the act

---

[23] Defendant makes no claim of guilt phase prejudice from the *Beeman* error, probably because the jury received correct shared-intent instructions in connection with the felony-murder special-circumstance allegations (see *ante* at p. 25).

of sodomy.[24] If the jury believed the prosecution's case, therefore, it could not have determined that defendant, although knowing the perpetrator's criminal purpose, participated without intent to further that purpose; rather, the jury would have concluded either that defendant knew of and shared the perpetrator's intent or that he had nothing to do with the sodomy. Omission of the shared-intent element thus was harmless.

### J. *Accomplice Instructions.*

Defendant contends the court's guilt phase instructions on accomplice testimony require penalty reversal because Crenshaw's credibility was crucial to the determination of whether it was he or defendant who committed the charged and other murders.

At the guilt phase the trial court delivered the standard instructions on the suspect nature of accomplice testimony.[25] Defendant argues the court undermined the effectiveness of the instructions and improperly enhanced Crenshaw's credibility by the improper modification of CALJIC No. 3.16 and the delivery of CALJIC No. 2.11.5 and a modified version of No. 2.50.

#### 1. *CALJIC No. 2.11.5.*

CALJIC No. 2.11.5 advises the jury there has been evidence in the case indicating someone other than the defendant was or may have been involved in the crime for which the defendant is on trial and instructs the jury not to discuss or give any consideration as to why the other person is not being prosecuted or whether he has been or will be prosecuted. Defendant argues that, contrary to this instruction, the jury should have given thorough consideration to why Crenshaw was not being prosecuted along with defendant and what he might have hoped to gain from his testimony.

Although defendant is correct that CALJIC No. 2.11.5 should not be given in cases when the other person is a witness for either the prosecution or the defense (see use note to CALJIC No. 2.11.5 (4th ed. 1979); *People* v.

---

[24]Smith, testifying for the prosecution, stated that defendant told him a move would be made on him—either a sexual assault or a stabbing—and offered to protect him if Smith would agree to sodomy. When a group of inmates later declared their intent to sodomize Smith, defendant told him he "had no choice." Defendant, declaring that he would "get seconds," subsequently held Smith's head while one of the group perpetrated the sodomy.

Inmate Robert Porter, one of the alleged perpetrators, testified for the defense that defendant was not involved in the act.

[25]The accomplice instructions given included the 1979 revisions of CALJIC Nos. 3.10 (accomplice defined), 3.11 (testimony of accomplice must be corroborated), 3.12 (sufficiency of evidence to corroborate an accomplice), and 3.18 (testimony of accomplice to be viewed with distrust).

*Williams* (1988) 45 Cal.3d 1268, 1313 [248 Cal.Rptr. 834, 756 P.2d 221]), its use here could not have been prejudicial. The jury knew that Crenshaw had entered a plea in the White murder, that he was involved in the present offenses, that his counsel had approached the district attorney about negotiating a plea and obtaining "the best possible disposition" of his case,[26] and that although Crenshaw initially had been charged with a special circumstance murder, at the time of trial he was facing only a non-special-circumstance charge. The jury was told it could consider the bias, interest and motives of any witness (CALJIC No. 2.20) and if defendant committed the crimes charged, Crenshaw was an accomplice as a matter of law whose testimony should be viewed with distrust (CALJIC No. 3.16, as modified; see also *ante,* fn. 25, p. 50). Implicit in the direction to view an accomplice's testimony with distrust is the judgment that an accomplice has an implied motive to testify in a manner beneficial to himself. Defense counsel emphasized this point, informing the jury Crenshaw was an accomplice as a matter of law and the reason it would be instructed to view his testimony with distrust is "he may want to escape prosecution and it may take some of the heat off of him in some fashion if he can wriggle his way out of this mess." The prosecutor, although informing the jury it was not to speculate as to what would happen to Crenshaw, readily acknowledged that "Mr. Crenshaw is up to here (indicating) in this case. There is no question in my mind at all about that. I don't know that there should be in your minds either. . . . Certainly he tried to exculpate himself from the situation, but certainly as well, he was a follower. . . ."

In sum, the jury had before it evidence, argument and instructions underscoring Crenshaw's possible motive to lie and its duty to view his testimony with distrust. In the circumstances we believe "a reasonable juror would continue to act in accordance with the court's charge on accomplice testimony, but would simply refrain from discussing or giving any consideration to the separate issue why [Crenshaw] was not being prosecuted in the present action or whether he . . . would be prosecuted." (*People v. Williams, supra,* 45 Cal.3d at p. 1313.) Any error in giving CALJIC No. 2.11.5 was harmless. (See *People v. Silva* (1988) 45 Cal.3d 604, 627 [247 Cal.Rptr. 573, 754 P.2d 1070].)

---

[26] Crenshaw's counsel, Lawrence Freeman, was examined at length concerning his efforts to obtain a favorable disposition for Crenshaw, the district attorney's refusal to negotiate, and his ultimate decision to allow Crenshaw to testify at the preliminary hearing based on the district attorney's "loose" agreement to "see what we could do." According to Freeman, the situation was "that nobody really wanted Mr. Crenshaw very badly." In the district attorney's opinion, Crenshaw was "less culpable" than defendant. Although Mr. Admire (the prosecutor in defendant's case) had offered nothing for Crenshaw's testimony, Mr. Freeman had a "tacit understanding" with Dick Crouter, another district attorney, that there were going to be "some concessions made somewhere in [Crenshaw's] prosecution." Part of the understanding was that it might never go to trial, that "the prosecution wanted to use Mr. Crenshaw as a conduit to get to Malone."

## 2. *CALJIC No. 3.16.*

 Defendant maintains the trial court nullified the rule of section 1111[27] and diluted the admonition to view accomplice testimony with distrust, by improperly modifying CALJIC No. 3.16, to state that "If the crime of kidnapping and/or robbery and/or murder was committed *by the defendant,* the witness Michael K. Crenshaw was an accomplice as a matter of law and his testimony is subject to the rule requiring corroboration." (Italics denotes modification.)[28] The modification, defendant argues, made a finding of defendant's guilt a prerequisite to viewing Crenshaw's testimony with distrust and thus prevented the jury from applying the distrust and corroboration requirements to Crenshaw's testimony in the process of deciding defendant's guilt.

We believe the court's modification is potentially confusing and should not have been given. In determining whether error occurred, however, "we must look to the entire charge, rather than merely one part, . . ." (*People* v. *Chavez* (1985) 39 Cal.3d 823, 830 [218 Cal.Rptr. 49, 705 P.2d 372].) The jury was fully instructed on the need to view accomplice testimony with distrust and the need for corroboration. Both the prosecution and defense proceeded on the premise Crenshaw was an accomplice and argued whether his testimony was corroborated. "On review even if an erroneous instruction is included reversal is required only when it appears the error was likely to have misled the jury." (*People* v. *Martin* (1983) 150 Cal.App.3d 148, 158 [197 Cal.Rptr. 655]; accord, *People* v. *Williams, supra,* 45 Cal.3d at p. 1313.) In the case at bench, the reference to defendant in CALJIC No. 3.16 could not have misled a reasonable juror into believing the accomplice instructions were inapplicable to Crenshaw's testimony as it applied to the question of defendant's guilt.

## 3. *CALJIC No. 2.50.*

Defendant contends the court improperly modified former CALJIC No. 2.50 (1979 rev.) (evidence of other offenses) to permit the jury to consider evidence of other crimes to corroborate Crenshaw's testimony, as well as for identity and motive.[29] This modification, he argues, is unsupported by logic and authority.

---

[27] Section 1111 provides in pertinent part that a "conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; . . ."

[28] The standard version of CALJIC No. 3.16 (1979 rev.) states in pertinent part: "If the crime of _____ was committed by anyone, the witness _____ was an accomplice as a matter of law . . . ."

[29] CALJIC No. 2.50 (1979 rev.), as modified by the court, provided in pertinent part that evidence of other crimes "was not received and may not be considered by you to prove that

 In *People* v. *Tassell, supra,* 36 Cal.3d 77, decided after trial in this case, we held other-crimes evidence is inadmissible solely to corroborate the prosecuting witness. CALJIC No. 2.50 has since been revised to omit any reference to corroboration. In *Tassell* we recognized, however, that if evidence of other crimes is admitted for some legitimate purpose, it will often tend to corroborate the victim of the charged crime. (See *id.* at p. 87.)

Here, unlike *Tassell,* the court's modification referred not to a witness, but to an accomplice. The guilt phase evidence of defendant's other crimes—the White murder, the Combs kidnapping, the Rankin kidnapping—was, as indicated, properly admitted. The distinctive features of those offenses, including defendant's propensity to put his victims in the trunk of a car, logically tended to corroborate Crenshaw's testimony concerning the circumstances of the instant offense and would have been viewed in that light, even absent the court's modification. The penalty phase evidence of additional crimes—the Parr murder and the Rankin murder —was also properly admitted for purposes other than corroboration of Crenshaw and likewise tended to corroborate his testimony.

The court instructed the jury that the other-crimes evidence could not be used to show defendant's disposition to commit crimes. There was ample other evidence to corroborate Crenshaw's testimony, including defendant's confession to Laughlin and physical evidence. The evidence in aggravation was overwhelming. We thus find no reasonable possibility of a more favorable result had the court not delivered the modified instruction.

K. *Rejection of Defense Instructions.*

1. *Disposition of Accomplice's Case.*

 Crenshaw, defendant's crime partner, pleaded guilty in the White case to a nonspecial circumstance first degree murder for which he received a sentence of 25 years to life and, at the time of defendant's penalty trial, was awaiting trial on a charge of nonspecial circumstance first degree murder in the Benham case. Defendant maintains the court erred in rejecting

---

[the defendant] is a person of bad character or that he has a disposition to commit crimes. [¶] Such evidence was received and may be considered by you only for the limited purpose of determining if it tends to show: [¶] A characteristic plan or scheme . . . which would further tend to show, the identity of the person who committed the crime, . . . a clear connection between the other offense and the one of which defendant is accused so that it may be logically concluded that if defendant committed the other offenses he also committed the crime charged in this case[,] and/or the corroboration of the testimony of *an accomplice*." (Italics denotes modification.)

The standard version of the instruction, before its 1984 revision deleting any reference to corroboration, referred to corroboration of the testimony of "the prosecuting witness."

defense instructions that would have directed the jury in determining the appropriate penalty to consider the disposition of the White charge and the noncapital nature of the Benham charge against Crenshaw.

In *People* v. *Belmontes* (1988) 45 Cal.3d 744 [248 Cal.Rptr. 126, 755 P.2d 310] we rejected the similar contention that the trial court erred in excluding evidence at the penalty phase of the pleas and negotiated dispositions of the defendant's accomplices. We stated that evidence of the accomplices' negotiated plea dispositions—"*separate and apart from evidence of their complicity and degree of involvement in the instant offenses* —bore no relevance to the jury's properly guided function at the penalty phase." (*Id.* at p. 811, italics in original; accord, *People* v. *Dyer, supra,* 45 Cal.3d 26, 69-71.) This conclusion was founded on the principle that the jury, in making its penalty determination, is required to focus on the character and record of the individual offender and, as to these, the disposition of charges against the defendant's accomplices has no relevance.

In the case at bench the jury was aware of Crenshaw's plea and sentence in the White case and the nature of the charges against him in the Benham case. Both sides fully argued Crenshaw's and defendant's relative culpability. For the reasons stated in *Belmontes, supra,* 45 Cal.3d at pages 811-812, we find the court did not err in refusing to instruct the jury to consider the nature or disposition of the charges against Crenshaw in making its penalty determination.

2. *Definition of Mitigating and Aggravating Circumstances.*

 Defendant argues the trial court erred in rejecting his proffered instruction relating to aggravating and mitigating circumstances.[30]

The first two paragraphs of the instruction define aggravating and mitigating circumstances in terms similar to those approved in *People* v. *Davenport, supra,* 41 Cal.3d at page 289. Although giving the instructions may

---

[30] Defendant's proffered instruction provided in relevant part: "Aggravating circumstances are circumstances attending the commission of the crime which increases its guilt or enormity, or adds to its injurious consequences, but which is above and beyond the essential elements of the crime itself.

"Mitigating circumstances are circumstances that do not constitute a justification or excuse of the offense in question, but which, in fairness and mercy, may be considered in extenuating or reducing the degree of moral culpability.

"In deciding whether the defendant should be sentenced to death or to life in prison without the possibility of parole, you must weigh the mitigating circumstances against the aggravating circumstances that you find to be established by the evidence. The fact that he has been found guilty beyond a reasonable doubt of the crime of murder in the first degree is not itself an aggravating circumstance."

have provided a "helpful framework" for the jury's consideration of the statutory circumstances in aggravation and mitigation (*People v. Dyer, supra,* 45 Cal.3d at p. 82), the court's refusal was not error. "Aggravation" and "mitigation" are commonly understood terms. A trial court is not required to instruct on the meaning of terms that are commonly understood. (Cf. *People v. Page* (1980) 104 Cal.App.3d 569, 577 [163 Cal.Rptr. 839] [statutory language is generally sufficient].) We believe the jury, without definition of the terms, is capable of deciding which of the statutory factors increase the "guilt or enormity" of a crime (*People v. Davenport, supra,* 41 Cal.3d at p. 289) and which extenuate or reduce the degree of moral culpability (*ibid.*). (Cf. *People v. Ghent, supra,* 43 Cal.3d at p. 777 [determining which factors are "applicable"].)

It is established, of course, that in determining penalty the jury is permitted to consider in aggravation only evidence relevant to the statutorily enumerated aggravating factors, but is required to consider in mitigation any evidence bearing on defendant's character and background that he proffers as a basis for a sentence less than death. (*People v. Boyd, supra,* 38 Cal.3d 762, 775; *People v. Easley, supra,* 34 Cal.3d 858, 878.) In the instant case no confusion on this point could have occurred: the court fully instructed the jury as to the circumstances it should consider in reaching its penalty determination; there was no prosecutorial argument or other basis for confusion as to which factors were aggravating and which mitigating (cf. *Davenport, supra,* 41 Cal.3d at pp. 288-290; *People v. Rodriguez, supra,* 42 Cal.3d at pp. 789-790); and defense counsel argued defendant's mitigating background and character evidence at length.

The final paragraph of the requested instruction directed the jury to weigh the mitigating and aggravating circumstances in reaching its penalty determination and informed it that defendant's guilt of first degree murder was not in itself an aggravating circumstance. The first part was essentially duplicative of the court's modified version of CALJIC No. 8.84.2, pursuant to which the jury was instructed to weigh the applicable factors in making its penalty determination and, moreover, was given the option of not imposing the death penalty even if the aggravating factors did outweigh the mitigating factors (*ante,* fn. 16, p. 39). The second part was potentially confusing in that it conflicted somewhat with CALJIC No. 8.84.1, par. (a), which told the jury to consider the circumstances of the crime in determining punishment, and also was potentially misleading, in that defendant's prior murder conviction was a special circumstance which the jury could consider. Refusal of these two proffered instructions thus was not error.

### L. *Cumulative Effect of Errors.*

■■■ Defendant maintains that even if no single error caused sufficient prejudice to warrant reversal, the cumulative effect of the asserted errors denied him a fair penalty trial, mandating reversal of the penalty judgment. We disagree. As penalty phase error we have identified (1) the prosecutor's insinuations of defense witnesses who refused to testify and an additional murder; (2) *Beeman* error concerning the Smith sodomy; (3) certain of the accomplice instructions; and (4) consideration of the White murder under factor (c) as well as factors (a) and (b).

Even in combination, these errors do not warrant reversal. As we have noted, with twenty-four witnesses testifying for defendant, the implication others were asked but refused to testify was patently harmless; the insinuation of an additional murder was refuted by Combs's prior trial testimony and was insignificant in any event in light of defendant's four proven murders; the asserted *Beeman* error was harmless in light of the evidence demonstrating defendant either assisted the sodomy with intent it occur or was not involved; the jury was fully and repeatedly informed by the court's instructions and both counsel's argument that Crenshaw's testimony should be viewed with distrust; and, finally, the jury was fully aware of the White murder and its circumstances, and neither the court's instructions nor the prosecutor's argument suggested the murder should weigh more heavily because it came within three, rather than two, statutory factors.

The aggravating evidence showed that, alone and with Crenshaw, defendant perpetrated multiple brutal criminal acts, including four murders, during the short period of his freedom after escaping from jail; and that soon after his return to jail he participated in a violent sexual assault on a fellow inmate. The mitigating evidence showed a troubled childhood and a hyperactive and antisocial personality. Under these circumstances, we find there is no reasonable possibility of a more favorable penalty verdict in the absence of the errors. (*People* v. *Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135]; see *People* v. *Lucky, supra,* 45 Cal.3d at pp. 303-304.)[31]

---

[31] Defendant has asked that we take judicial notice of the penalty verdicts in another multiple-murder case wherein the jury sentenced the defendant to life without possibility of parole. We deny the request.

In *People* v. *Allen, supra,* 42 Cal.3d 1222, in the context of rejecting the application to capital sentences of the disparate sentence statute (§ 1170, subd. (f)), we observed that the "nonquantifiable" aspects of capital sentencing are great and "the 'evidence or observation[s]' that persuaded juries in apparently 'comparable' cases *not* to assess the death penalty may not be immediately apparent from the record. [Citation.]" (*Id.* at p. 1287, italics in original.) Defendant himself has recognized that a capital sentencing jury weighs intangibles, few of which

## M. *Modification Motion*.

As reversible error in denying his automatic motion for modification of penalty (§ 190.4, subd. (e)), defendant asserts the court's findings of no mitigating evidence and lack of remorse and its artificial inflation of aggravating circumstances and mechanical balancing of factors.

### 1. *Lack of Mitigating Evidence*.

Concerning mitigating evidence, the trial court stated in part that it had examined the material offered by defendant in the penalty phase "and finds beyond any reasonable doubt that there are no circumstances which extenuate the gravity of the crime, whether or not such circumstances were a legal excuse. None of the witnesses called on behalf of the defendant could offer any explanation or give any evidence of any conceivable circumstances that the Court finds would extenuate the gravity of this crime." Reviewing the evidence of defendant's troubled youth and attention-deficit disorder and his diagnosis as an antisocial personality, the court concluded that in its opinion "None of this evidence would be a moral justification or extenuation of the brutal murder of the victim . . . by defendant and his cohort, Michael Crenshaw."

Defendant contends the court misunderstood the permissible scope of relevant mitigating evidence by restricting its consideration to evidence within the narrow terms of section 190.3 factor (k), i.e., evidence which extenuates the gravity of the crime, without considering other sympathetic aspects of defendant's character and background that he proffered in mitigation.

We are unpersuaded. The record shows the court was aware of the full scope of defendant's mitigating evidence, but determined nothing in this evidence sufficed to explain or mitigate the "brutal," the "vicious and wanton, inhumane" nature of the crime. (See *People* v. *Babbitt, supra,* 45 Cal.3d 660, 723-724.) The court, as it stated at the outset of its ruling, thus agreed with the jury that "the circumstances in aggravation outweigh[] the circumstances in mitigation" and "the selection of the proper penalty to be

can be gleaned from an appellate record. (*Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 330 [86 L.Ed.2d 231, 240, 105 S.Ct. 2633]; see *People* v. *Lanphear* (1984) 36 Cal.3d 163, 167 [203 Cal.Rptr. 122, 680 P.2d 1081].)

The peculiarly normative and individualized nature of the jury's sentence determination in each case makes it inappropriate and of no benefit to consider the sentence imposed in superficially similar cases for the purpose of determining the prejudicial effect of error.

death is supported by the weight of the evidence." Finally, in light of the court's stated view of the nature of the crime as well as the other aggravating factors, including defendant's four proven murders, the asserted error in the court's consideration of defendant's mitigating evidence could not have prejudiced defendant. (See *People* v. *Brown, supra,* 46 Cal.3d at p. 462.)

2. *Artificial Inflation of Aggravating Factors and Mechanical Balancing of Factors.*

Defendant asserts the trial court impermissibly considered both felony-murder special circumstances and engaged in the "double counting" of aggravating factors under paragraphs (a), (b) and (c) of CALJIC No. 8.84.1, thus artificially inflating the circumstances weighing in favor of death. He argues further that the court improperly based its decision on a mechanical balancing process rather than an independent assessment of whether death was the appropriate punishment, an error assertedly compounded by its implied findings that the absence of certain mitigating factors was an aggravating circumstance.

Nothing in the court's statement of reasons supports defendant's assertions of error. The court did not apply the evidence to specific enumerated factors and tally aggravating as against mitigating factors. Rather, it recited the evidence, the special circumstances and the applicable and inapplicable aggravating and mitigating factors as part of an integrated process directed to determining whether the evidence supported the jury's choice of death as the appropriate penalty in light of the offense and the offender. The court's instruction to the jury that if aggravating circumstances outweighed mitigating it could (but was not required to) impose a sentence of death (*ante,* fn. 16, p. 39) refutes defendant's claim the court understood the process to be one of a mechanical weighing of factors.

Nor did the court err in reciting mitigating factors that did not apply, e.g., that defendant did not act under duress or the domination of another person, "to wit: Crenshaw"; he was not an accomplice whose participation was relatively minor; he was not under the influence of mental or emotional disturbance; and his age had no "bearing in mitigating his homicidal conduct." Because this was a two-person crime and much of the defense was directed to placing primary responsibility on Crenshaw, defendant's relative culpability was relevant. And because defendant had placed his emotional and mental problems in issue, these too were relevant. ▮ A court does not err in observing the inapplicability of potentially relevant mitigating factors. (Cf. *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 789-790.) Nothing in the court's statement suggests it considered the absence of the mitigating

factors a circumstance in aggravation. (Compare *Rodriguez, supra,* with *People* v. *Davenport, supra,* 41 Cal.3d 247, 288-289.)

### 3. *Lack of Remorse.*

Defendant urges the trial court's reliance on his asserted lack of remorse impermissibly infringed on his constitutional rights (*People* v. *Coleman* (1969) 71 Cal.2d 1159, 1168-1169 [80 Cal.Rptr. 920, 459 P.2d 248]), penalized him for failing in his guilt phase testimony to mention something irrelevant to the issues and thus inadmissible, engaged in speculative inferences from his silence and considered a nonstatutory factor in aggravation in violation of *People* v. *Boyd, supra,* 38 Cal.3d at pages 775-776.

In *People* v. *Ghent, supra,* 43 Cal.3d 739, 771 (1977 law) and other recent cases (e.g., *People* v. *Dyer, supra,* 45 Cal.3d at p. 82 [1978 law]; *People* v. *Miranda, supra,* 44 Cal.3d at pp. 111-112 [same]) we have considered and rejected the contention that consideration of a defendant's lack of remorse is error. We adhere to those decisions here. We note, moreover, that in the instant case the court's observation that defendant lacked remorse need not have derived from defendant's silence: defendant's statements to Laughlin that he got a thrill out of killing people fully supported its finding.

The trial court's charge under section 190.4, subdivision (e) is to review the evidence and, guided by the factors set forth in section 190.3, to determine "whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." In the instant case the court properly concluded the jury's findings and verdict were supported by the evidence and the law.

### N. *Constitutionality of Statute.*

Defendant makes familiar arguments concerning the constitutionality of the 1978 death penalty statute. He maintains the statute is unconstitutional under the due process clause of the California and federal Constitutions (Cal. Const., art. I, §§ 7, subd. (a), 15; U.S. Const., Amend. XIV) for failure to require as a prerequisite to imposition of the death penalty that the jury find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors and that death is the appropriate penalty. We have rejected the identical constitutional challenge in *People* v. *Rodriguez, supra,* 42 Cal.3d at pages 777-778. (Accord, *People* v. *Gates, supra,* 43 Cal.3d at p. 1201.)

Defendant asserts that the 1978 statute is constitutionally infirm as lacking in certain procedural safeguards to ensure against arbitrary death judg-

ments, e.g., specification of aggravating and mitigating factors; a requirement that the jury find aggravating circumstances unanimously and beyond a reasonable doubt; written findings as to the aggravating factors relied on in imposing a sentence of death; and appellate proportionality (comparative sentence) review. Each of his arguments has been considered and rejected in recent opinions. (E.g., *People* v. *Allen, supra,* 42 Cal.3d 1222, 1285; *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779.)

## IV. CONCLUSION

For the reasons stated, the judgment is affirmed in its entirety.

Lucas, C. J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.**—I concur in the judgment.

However, I have problems with the cavalier treatment of the potential racial prejudice gratuitously injected into this case by the prosecutor. The majority appear willing merely to declare the inquiry about gangs was "arguably" improper and error. They should forthrightly state it was error, and then proceed to discuss prejudice.

Relationship of Black gangs to the sodomy of Smith was tenuous at best. The implication appears to be that only prison Blacks commit sodomy. We know from any number of previous cases that unfortunately sodomy in prison is not uncommon and that it is committed by prisoners of all races on prisoners of all races.

Although the prosecutor deserves criticism for injecting race into this case, under all the circumstances I cannot find prejudice to the defendant. For that reason I concur with the majority.

**BROUSSARD, J.**—I concur in the affirmance of the judgment as to guilt and in the sustaining of the special circumstance findings.

I dissent, however, from the affirmance of the judgment as to penalty. I disagree with the majority's holding that the jury may consider two special circumstance allegations describing an indivisible course of conduct as separate aggravating factors. Further, the record demonstrates to me that the trial court, in ruling on the automatic application for modification of the verdict of death under Penal Code section 190.4, subdivision (e), misapplied the law defining the relevance of mitigating evidence regarding defendant's character and background.

The jury found two special circumstances to be true: robbery-murder and kidnapping for the purpose of robbery (Pen. Code, § 190.2, subd. (a)(17)(i) and (ii)). I agree with defendant's contention that these special circumstances describe an indivisible course of conduct, namely, the robbery of Benham. The majority find it appropriate to allow the jury to rely on each crime which is the basis of a special circumstance finding as a separate aggravating factor since " '[e]ach of the crimes underlying the felony-murder special circumstances invades a distinct interest which society seeks to protect by defining these acts as crimes.' " (Maj. opn., *ante,* at p. 45, quoting *People* v. *Bean* (1988) 46 Cal.3d 919, 955 [760 P.2d 996].)

I disagree with this holding, for the reasons stated in my dissent in *People* v. *Melton* (1988) 44 Cal.3d 713, 772 et seq. [244 Cal.Rptr. 867, 750 P.2d 741]. The use of duplicative aggravating factors falsely inflates the aggravating circumstances of the crime and fails to guide the jury adequately. We should adhere to the plurality view in *People* v. *Harris* (1984) 36 Cal.3d 36, 65 [201 Cal.Rptr. 782, 679 P.2d 433], that when two crimes giving rise to separate special circumstance findings arise out of an indivisible course of conduct, the two crimes should be considered as a single aggravating circumstance.

I would not reverse the penalty verdict on this basis, since there appears no reasonable possibility that the error in allowing duplicative special circumstances to be used in aggravation affected the verdict. I do dissent from the affirmance of the penalty verdict, however, because of the trial court's error in ruling on the automatic application for modification of the verdict of death.

Penal Code section 190.4, subdivision (e) provides that in ruling on the automatic application for modification of the verdict, "the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." The court must make an "independent determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law." (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 793 [230 Cal.Rptr. 667, 726 P.2d 113].)

It must be apparent that the court cannot fulfill its obligation to make an independent determination whether the penalty is proper if it does not apply the applicable law correctly. It is established that all evidence regarding defendant's character or background which he proffers as a basis for

rejecting the death penalty must be considered, whether or not the evidence extenuates or mitigates the gravity of the charged offenses. (*People* v. *Easley* (1983) 34 Cal.3d 858, 875 et seq. [196 Cal.Rptr. 309, 671 P.2d 813].) The record demonstrates that the trial court erroneously limited its consideration of mitigating evidence to the literal terms of Penal Code section 190.3 factor (k), that is, to evidence which actually extenuated the gravity of the crime. As the majority note, the trial court stated that "there are no circumstances which extenuate the gravity of the crime, whether or not such circumstances were a legal excuse. None of the witnesses called on behalf of the defendant could offer any explanation or give any evidence of any conceivable circumstances that the Court finds would extenuate the gravity of this crime." The court later reiterated: "None of this evidence [of defendant's troubled youth and mental disorders] would be a moral justification or extenuation of the brutal murder of the victim. . . ." (Maj. opn., *ante,* at p. 57.)

The majority are confident that the trial court considered all of defendant's mitigating evidence, but that none of it mitigated the horror of the charged crimes. (Maj. opn., *ante,* at p. 57.) However, the law requires that the mitigating evidence be considered not only if it mitigates the charged crimes, but also if it provides a basis for a penalty less than death. It is apparent that the trial court failed to consider the proffered mitigating evidence for this purpose. We should not be reluctant to remand to trial courts for the relatively simple matter of reconsidering their rulings on motions to modify the verdict, when they have erred in applying the law. "[W]hen we consider a judge's ruling on the motion to modify, there is no reason to tolerate any degree of ambiguity. A remand for a new modification hearing, in contrast to a new trial, involves minimal judicial resources and minimal delay. There is no reason to guess as to whether the trial judge considered the mitigating evidence, or whether it would have made a difference if he had considered it. We can send the case back, direct him to consider it, and find out if it makes any difference." (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 160 [249 Cal.Rptr. 320, 756 P.2d 1348] (conc. and dis. opn. of Broussard, J.).)

I would vacate the penalty judgment and remand with directions to the trial court to reconsider the application in light of the applicable law. (See *People* v. *Rodriguez, supra,* 42 Cal.3d at p. 794.)

Appellant's petition for a rehearing was denied January 9, 1989, and the opinion was modified to read as printed above.