Filed 10/21/22 P. v. Jamieson CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>BROCK COLM JAMIESON,<br><br>        Defendant and Appellant. | F083779<br><br>(Super. Ct. No. BF185396A)<br><br><br>**OPINION** |

**THE COURT**[*]

APPEAL from a judgment of the Superior Court of Kern County. John W. Lua, Judge.

H.A. Sala, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill, and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]        Before Peña, Acting P. J., Smith, J. and Snauffer, J.

Defendant Brock Colm Jamieson was convicted by jury trial of felony and misdemeanor vandalism. On appeal, he contends the trial court abused its discretion and violated his right to due process by admitting evidence of a prior uncharged act.

## PROCEDURAL SUMMARY

On May 10, 2021, the Kern County District Attorney filed a complaint charging defendant with two counts of felony vandalism (Pen. Code, § 594, subd. (b)(1); counts 1 and 2).[1] Count 1 related to the vandalism of tires on a Jeep on April 19, 2021, and count 2 related to the vandalism of a Jeep on April 20, 2021. Defendant pled not guilty as to both counts.

On September 3, 2021, the jury found defendant guilty of the lessor included offense of misdemeanor vandalism (§ 594) in count 1, and guilty as charged in count 2.

On November 23, 2021, the trial court sentenced defendant as follows: as to count 2, he was sentenced to a two-year split sentence with one year in county jail and one year on mandatory supervision. As to count 1, he was sentenced to county jail for one year to be served concurrent to count 2.

On January 14, 2022, defendant filed a notice of appeal.

## FACTUAL SUMMARY

**April 19, 2021 Incidents**

On April 19, 2021, Leslie Holter was visiting Bakersfield and staying on the second floor of a hotel, in a room that overlooked the hotel's parking lot. At approximately 10:00 a.m., he observed an individual in a white SUV pull up behind a parked black Jeep in the parking lot below his balcony. Holter later identified the individual as defendant in court. Defendant entered the passenger's side of the Jeep and rummaged through the vehicle for a couple of minutes. Holter stated it appeared as if defendant were looking for something. Holter took photos when defendant pulled up in

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

his white SUV and entered the black Jeep. One photo captured a partial license plate of the white SUV.

Approximately an hour later, Holter observed defendant return to the parked black Jeep. He appeared to have something in his hand and placed it "up into the passenger's side rear tire well." At some other point that same day, Holter was lying in bed with his balcony door open, when he heard a "loud rush of air." He got up and went to the balcony door and observed defendant "puncturing something into the tires on the driver's side of [the black] Jeep." He said he heard him puncture one tire and then saw him puncture a second tire. Holter noticed defendant drove two separate vehicles at different points—a white SUV and a black SUV. Holter called the hotel's front desk and dialed 911. He took several pictures with his phone capturing defendant's actions and gave them to law enforcement.[2]

During one of the incidents, Holter observed defendant park behind the black Jeep and open the passenger's door and spray bear mace inside. He said he was "pretty sure" it was the black Jeep. He knew it was bear mace because the spray made its way up the balcony door and "hit" him. He had been in contact with bear mace on three prior occasions and was familiar with it.

**April 20, 2021 Incidents**

On April 20, 2021, at about noon, Michael Hankins, owner of the black Jeep, was at the hotel parking lot when he observed a verbal argument between defendant, Brian Chapman, and Britt Helstrom, and began recording it with his phone. The video depicted Helstrom standing next to defendant's white SUV and an orange Jeep that also belonged to Hankins. Helstrom and defendant were arguing. Chapman was in the driver's seat of the orange Jeep and its windshield was intact at that time. In the video, defendant could

---

[2] Holter identified the individual in the photos as the defendant in court and as the same person he observed during the first incident.

be heard saying, " 'I'm going to do exactly what he did the other night.' " As defendant pulled away, Hankins heard what he believed to be the sound of an aerosol spray, but did not see it. Hankins observed wet paw prints from a dog. The video captured the following colloquy:

"[DEFENDANT]: I'm mad because you tried to kill me the other night, you motherf***er! You tried to kill me! You tried to run me over!

"CHAPMAN: [[I]naudible]

"HELSTROM: What are you going to do?

"[DEFENDANT]: [[I]naudible]

"HELSTROM: You're not going to do anything stupid. My dog … my dogs are in the f***ing car!

"HANKINS: Hey don't hit [car honking[.]]

"HELSTROM: [Defendant]! Don't! My dogs are in the f***ing car!

"[DEFENDANT]: Get them out.

"HELSTROM: Stop! Don't! Don't!

"[DEFENDANT]: Get them out.

"HELSTROM: My dogs! No, [defendant]! Stop!

"[DEFENDANT]: I'm going to do exactly what he did the other night.

"HELSTROM: Stop it [defendant]! My dogs!

"[DEFENDANT]: Get them out! Get them out!

"HELSTROM: No, [Chapman], wait, wait.

"CHAPMAN: I'm backing up.

"HELSTROM: Stop, [defendant]!

"[DEFENDANT]: Get them out of the car.

4.

"HELSTROM:  My dog.  [Chapman] …

"[DEFENDANT]:  Who the f*** are you, fa**ot?

"HANKINS:  F*** you, punk!

"HELSTROM:  What are you doing, [Chapman]?

"CHAPMAN:  I'm getting the front of my f***ing car in …

"[DEFENDANT]:  Get them out of the car.

"CHAPMAN:  God da**it, you're a f***ing b***ard.

"HELSTROM:  What the f***, dude?

"[DEFENDANT]:  I'm going to do exactly what you did the other night, you f***ing punk.

"CHAPMAN:  I didn't f***ing do sh**.

"[DEFENDANT]:  Get them out of the car.

"HELSTROM:  No my dogs.

"[DEFENDANT]:  Put the camera down you f***ing …

"HANKINS:  F***ing eat a d***[.]

"HELSTROM:  [[I]naudible]  Don't [defendant]!  Wait! [Screaming]  My dogs!  [Crying]  He sprayed my f***ing dog.  I can't see."

Hankins testified he had been "bear maced" once prior to the date of the incident. After the altercation, he stepped out of his vehicle and felt the same sensations he had experienced when he had previously come into contact with bear mace.  The mucus membranes in his nose, throat, and eyes were burning and he felt "very uncomfortable." Based on those sensations and the sound of the aerosol spray, he believed defendant had sprayed a "very large can of bear mace on everybody."

Later that day, at about 10:00 p.m., Holter was in his room with the balcony door open when he heard multiple "loud smack or pop-type" sounds that he thought were

5.

gunshots. He went to the door and saw defendant smash the windshield of an "orangish-brown" Jeep that was parked next to the black Jeep. He saw defendant's arm back away from the windshield as if he had just made contact with it, but he did not actually see him make contact with the windshield. Defendant was holding something black in his hand. Defendant then got into an SUV and drove off. Holter again dialed 911. Initially, he thought defendant was holding a firearm, but upon reflection he believed it was a "tire tool or something like that." Holter told the 911 operator the person who had smashed the windshield was the same person he saw the day before flattening the tires of the black Jeep and that the person was driving a white SUV.

Hankins arrived at the hotel parking lot between 10:30 and 11:00 p.m. and saw that his Jeeps had been vandalized. The orange Jeep's driver's side window and front windshield had been shattered and its interior had been saturated with bear mace. The black Jeep had two flat tires and was also saturated with bear mace. He described that the bear mace in the orange jeep "was like a liquid, orange in color, and very thick or vicious [*sic*] all over the dash, the seats, sprayed into the deck of the stereo, and then all over the top." He said the top of the black Jeep also appeared to be damaged by bear mace.

**Additional Testimony from Hankins**

Hankins testified he owned the two Jeeps and that he had given Chapman permission to operate both Jeeps on April 19 and 20, 2021. Hankins did not know defendant personally prior to April 19, 2021, but said he knew him "by reputation." He had previously seen defendant drive both a black SUV and a white SUV. He said defendant did not have permission to go into his black Jeep. Hankins identified defendant in court as the same individual depicted in the photographs. He also identified the white SUV and the black SUV as defendant's vehicles. Hankins said that the damage to both Jeeps exceeded $400.

6.

**DISCUSSION**

## I.    Evidence of Uncharged Acts

Defendant contends the trial court erred in allowing admission of the video under Evidence Code sections 1101 and 352 in violation of his due process right to a fair trial. He contends the video was highly prejudicial as it allowed the jury to consider improper character evidence in which he "assault[ed] an unarmed woman and her dog with mace without provocation." We conclude any error in admitting the evidence of the uncharged acts was harmless.

### A.    *Additional Background*

During pretrial in limine motions, defense counsel moved to exclude the video depicting defendant's argument with Chapman and Helstrom. The following discussion ensued:

> "[DEFENSE COUNSEL]: Yes, your Honor. I believe we did briefly touch it in the back regarding the video involving [defendant] that took place either prior to or in between the alleged acts in this matter that don't necessarily pertain to the actual facts of the charges alleged and I would ask to exclude this video.

> "THE COURT: Thank you. [¶] [Prosecutor], do you have any comment?

> "[PROSECUTOR]: Yes, your Honor. We'd obviously object to that motion. The video is highly probative to the circumstantial evidence to show that [defendant] had motive to conduct an act of vandalism as charged. In addition to that, it also shows [defendant] had access to bear spray, which is a chemical that was used in an act of vandalism. And so we believe it's probative in those matters.

> "[DEFENSE COUNSEL]: If I may speak further.

> "THE COURT: Yes.

> "[DEFENSE COUNSEL]: The alleged bear mace or whatever type of substance it was, there's no proof of this. I believe that the individual who was involved in the video—not the person filming it, but the person

7.

involved in the video—is not on the witness list and is not going to be in court for that portion.

"The person who allegedly—at least from what the People have provided, the person allegedly filming this incident was one of the named witnesses, but wasn't necessarily involved in the alleged incident.

"THE COURT: Okay.

"[DEFENSE COUNSEL]: And regarding that—well, I'll submit on that.

"[PROSECUTOR]: I do have one more thing to add, your Honor.

"In regards to that video, it does go to identity. The photos we have are not necessarily clear, but, when combined with the video, provide a clear identification of [defendant] inside a suspect vehicle.

"THE COURT: Is the suspect vehicle shown or will it be testified to by others?

"[PROSECUTOR]: To the person recording it, yes, recording the video.

"THE COURT: Setting aside the video, is that suspect vehicle shown in any other evidence that you intend to introduce?

"[PROSECUTOR]: In photographs, your Honor, yes.

"THE COURT: Okay. Thank you.

"[DEFENSE COUNSEL]: And if I may as well, that video—just some clarification with the vehicle. [¶] The vehicle that [defendant] is purported to be in in the video trying to be introduced, that is the vehicle that he is apprehended in as well at another time.

"THE COURT: Thank you.

"Counsel, involving this oral motion to exclude a video of the defendant prior to or in between the incidents, based on the People's responses, it appears that the probative value of that video is found circumstantially in being able to present motive, access to bear spray, as well as identification of the defendant inside the suspect vehicle.

"For those reasons, the probative value of this video certainly exists, and it appears, without anything more, that the probative value does

8.

outweigh any prejudicial effect of the introduction of this video. As stated, this is in between or prior to the alleged incidents contained in the Information. For those reasons, under [section] 352 the admissibility of the video will be dependent on whether foundation can be properly laid for its introduction.

"So, [prosecutor], as the proponent of this video, I am denying the defense's request to exclude the video outright for reasons just stated in the record, but you, as the proponent, will still have to nonetheless lay the necessary foundation for its admissibility."

At trial, the video was introduced into evidence without objection from defense counsel. During closing arguments, defense counsel argued as follows:

"Touching on the video, that video is a distraction, folks. That video doesn't pertain to the alleged actions. It does not pertain to [c]ount 1, the tires on the black vehicle. It does not pertain to [c]ount 2, to the orange vehicle. That is there to get you upset. That is there so that you are upset when you see [defendant] calling people names, arguing with another female, and allegedly spraying something at dogs. [¶] Yeah, he's not a great guy in that scene, but we're not here to judge his character. We're here to judge whether or not he committed the acts alleged in this case, specifically [c]ount 1, the tires of the black [Jeep], and in [c]ount 2, the damage in general."

The prosecutor argued as follows:

"And let's definitely get straight to the video, because [defense counsel] is quite upset about the video and the video's purpose, and he tried to confuse you about the video's purpose.

"It is not for you to get angry about what happened to the dog or to Ms. Helstrom. It was there to provide you evidence to show that, one, [defendant] is inside a suspect vehicle that is witnessed multiple times at multiple crime scenes, to confirm a partial license plate identified by Mr. Holter on April 19th, to confirm that it is the same license place that [defendant] is—or same vehicle and the same license plate [defendant] is seen in on April 20th.

"It also should be used to show evidence that bear spray was accessible to [defendant]. We're not bringing in the bear spray, again, so you get angry that the dog was sprayed or that Ms. Helstrom was sprayed, but that somebody was sprayed with bear mace and that somebody who sprayed it was [defendant].

9.

"We're also introducing the video to show that at noon on April 20th you can see in the video that there was no damage to the orange Jeep's windshield; that Mr. Chapman is driving that vehicle, in that vehicle, and there is no damage to the windshield at noon. Okay?"

The trial court instructed the jury that count 1 was based on an act that occurred on or around April 19, 2021, involving damage to the tires of the black Jeep. Count 2 was based on an act that occurred on or around April 20, 2021, involving a Jeep and there was no further specificity.

### B. Legal Principles

"Evidence Code section 1101, subdivision (a) provides that, subject to certain exceptions, 'evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence or specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.' " (*People v. Pineda* (2022) 13 Cal.5th 186, 221.) " 'Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition' [citation], with permissible purposes including but not limited to proving 'motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident' (Evid. Code, § 1101, subd. (b))." (*Ibid*.) However, "to be admissible[,] such evidence [of uncharged acts] 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404, superseded by statute on other grounds as stated in *People v. Britt* (2002) 104 Cal.App.4th 500, 505.) Evidence Code section 352 gives the court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

10.

"We apply an abuse of discretion standard when reviewing a ruling on an objection under Evidence Code sections 352 and 1101." (*People v. Pineda*, *supra*, 13 Cal.5th at p. 222.) "A ruling subject to this standard of review 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Ibid*.)

### C.    Analysis

As a preliminary matter the People assert defendant forfeited his challenge to the admission of the video because the grounds he raises on appeal were not raised below. However, assuming the claim has not been forfeited,[3] and assuming without deciding that the uncharged acts evidence was erroneously admitted, any error in its admission was harmless in light of the overwhelming evidence of defendant's guilt.

Considering the evidence's impact in the guilt phase, we review state law errors for prejudice under *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Harris* (2013) 57 Cal.4th 804, 842; *People v. Malone* (1988) 47 Cal.3d 1, 22.) This requires us to examine whether it was "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, at p. 836.) In light of the overwhelming evidence of defendant's guilt, it was not reasonably probable defendant would have received a more favorable result had the video been excluded.

At trial, Holter identified defendant as the individual who vandalized both Jeeps. On April 19, 2021, he saw him get into the black Jeep at 10:00 a.m. and then an hour later he saw him place something in the passenger's side rear tire well. He then saw him puncture the tires of the black Jeep. As discussed *ante*, the basis of count 1 was tire damage to the black Jeep. Holter testified, "I observed him puncturing something into the tires on the driver's side of that Jeep. [¶] … [¶] I saw him puncture one tire. I

---

**3**    We note that, because we assume defendant's claim has not been forfeited, we do not address his claim that he suffered ineffective assistance of counsel as a result of trial counsel's failure to object to the admission of the uncharged acts evidence.

heard a puncture on one tire and I observed a puncture on another." Holter took multiple pictures of defendant throughout the various incidents and identified him in court as the individual in the pictures. He saw defendant drive a white SUV and a black SUV, that were indeed registered in defendant's name according to a certified copy of a CLETS printout.

On April 20, 2021, at 10:00 p.m. Holter saw defendant smash the windshield of the orange Jeep. He said he went to the balcony door and saw defendant "actually smash the windshield of [the orange] Jeep." When he called 911 to report the windshield incident, he told the operator it was the same person he saw the night before "flattening the tires" of the black Jeep. He said, "[Defendant has] a beef with somebody who is staying here [at the hotel], because they've got another Jeep that I observed him flattening the tires on … yesterday." He reported defendant was driving a white SUV on the night he vandalized the orange Jeep. Likewise, Hankins testified he had previously seen defendant drive a white SUV and a black SUV and identified defendant in court as the same person in the photographs.

Additionally, Holter testified he observed defendant spray bear mace into the Jeeps. He saw defendant pull up to the black Jeep, open the passenger's door, and spray bear mace inside. He said, "I only know that it's that type of spray because it made its way up to the balcony door there and hit me." He had been in contact with bear mace on three prior occasions and was familiar with it. Hankins also testified he was familiar with bear mace and described that when he stuck his head into the orange Jeep after it had been cleaned, he had "[s]tinging eyes, nose, mouth, coughing" and "couldn't even get in it."

In sum, even without the video, there was ample evidence of defendant's identity as the perpetrator of the crimes. Holter personally observed him vandalize both Jeeps and took photos of defendant and his vehicles. Holter identified defendant as the perpetrator several times in court and during the 911 call on April 20, 2021. The CLETS

12.

report indicated the vehicles used in the commission of the crimes were registered to defendant and Hankins also testified he had seen defendant drive the two vehicles. Thus, even if we assume evidentiary error, we conclude any error was harmless in light of the overwhelming evidence of defendant's guilt.

## **DISPOSITION**

The judgment is affirmed.